**Jessica Bergin v. New York State Unified Court System**

**22-CV-5264-BMC**

**Plaintiff's Motion for Summary Judgment**

# Exhibit A:

# Deposition of Justin Barry (excerpts)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------X

JESSICA BERGIN,

Plaintiff,

v. Case No.: 22-cv-5264(BMC)

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.
-----------------------------------------X

June 1, 2023
9:37 a.m.

Examination of JUSTIN BARRY, held pursuant to Notice, held via Zoom conference, before Ruthayn Shalom, a shorthand Reporter and Notary Public within and for the State of New York.

A P P E A R A N C E S :

THE WARSHAWSKY LAW FIRM
Attorneys for Plaintiff
118 North Bedford Road, Suite 100
Mount Kisco, New York 10549
BY: STEVEN M. WARSHAWSKY, ESQ.
smw@warshawskylawfirm.com

NYS OFFICE OF COURT ADMINISTRATION
Attorneys for Defendant
25 Beaver Street, 10th Floor
New York, New York 10004
BY: MICHAEL J. SIUDZINSKI, ESQ.
msiudzin@nycourts.gov
-and-
BY: ROBYN L. ROTHMAN, ESQ.
rrothman@nycourts.com

IT IS HEREBY STIPULATED AND AGREED, by and between the attorneys for the respective parties hereto, that this examination may be sworn to before any Notary Public.

IT IS FURTHER STIPULATED AND AGREED that the sealing and filing of the said examination shall be waived.

IT IS FURTHER STIPULATED AND AGREED that all objections to questions except as to form shall be reserved for trial.

J. Barry

J U S T I N  B A R R Y, having been first duly sworn by Ruthayn Shalom, a Notary Public of the State of New York, and stating his address as 25 Beaver Street, New York, New York 10004, was examined and testified as follows:

EXAMINATION BY
MR. WARSHAWSKY:

Q Good morning, Mr. Barry.
A Good morning.
Q My name is Steven Warshawsky and I represent the Plaintiff, Jessica Bergin, in this lawsuit against the New York State Unified Court System. Sometimes during today's deposition I will refer to the Defendant as UCS. Will you understand that acronym to be referring to the New York State Unified Court System?
A Yes.
Q Today's proceeding is called a deposition, during which I will be asking questions related to Ms. Bergin's lawsuit that you're required to answer truthfully and to the best of your ability.
Do you understand?
A Yes.
Q Do you agree to do this?

J. Barry

Q Can you recall what cases those were in which you submitted a sworn affidavit?

A There were many of them. Forelli, their were two Forellis, I know, I think I submitted one in the PERB action, I submitted many of them.

Q Do you recall if the Forelli cases were in federal or state court?

A I think they were in federal. I think one was in federal and one was in state, but not something I keep track of. I have Michael and Robyn and a law department that track that.

Q Got it.

MR. SIUDZINSKI: We can find that information for you. There have been a few cases. We can find the names of the cases for you that the affidavits that have been submitted, let us know.

MR. WARSHAWSKY: I appreciate that, Michael.

BY MR. WARSHAWSKY:

Q If we can take a look at what has been marked as Plaintiff's Exhibit 1, which is the Deposition Notice.

(Plaintiff's Exhibit 1, Marked for Identification.)

J. Barry

BY MR. WARSHAWSKY:

Q Mr. Barry, do you have Plaintiff's Exhibit 1 in front of you?

A I do.

Q Is this one of the documents that you reviewed in advance of today's deposition?

A It is.

Q To confirm on the record, you have been designated to testify on behalf of the New York State Unified Court System in connection with this 30(b)(6) Deposition Notice?

A I have.

Q Are you employed by the court system?

A I am.

Q What is your position?

A My title is Chief of Administration.

Q How long have you been in that position?

A About two years.

Q Were you employed by the court system prior to being in the position you are in now?

A Yes.

Q What was the previous position that you held with the court system?

A Chief Clerk of New York City Criminal

Court.

Q Approximately how long were you in that position for?

A Eleven years.

Q In total, how many years have you been employed by the court system?

A Twenty-one.

Q Can you briefly describe your educational and professional background after high school?

A Went to college at Haverford College, I received a BA. I went to Villanova Law School, received a JD, and you want my education and that's it?

Q That's fine. So you're trained as an attorney?

A Yes.

Q Referring back to Plaintiff's Exhibit 1, have you had an opportunity to review the matters for examination listed on page two of this deposition notice?

A Yes.

Q Are you authorized to testify on behalf of the New York State Unified Court System with respect to each of the matters for examination listed on

J. Barry

this deposition notice?

A Yes.

Q Sitting here today, do you consider yourself sufficiently knowledgable or otherwise prepared to testify about information known or reasonably available to the court system with respect to each of the matters for examination listed on the deposition notice?

A Yes.

Q I would like to turn now to Plaintiff's Exhibit 3.

(Plaintiff's Exhibit 3, Marked for Identification.)

BY MR. WARSHAWSKY:

Q I will describe Plaintiff's Exhibit 3 for the record. This is a four-page document. It is not Bates-stamped. The top of the first page of the exhibit says, State of New York-Unified Court System Request for Religious Exemption from COVID-19 vaccination. Do you have that exhibit in front of you?

A I do.

Q Are you familiar with this form?

A I am.

Q Is this the form application that the

J. Barry

Q Now, the next line in the same paragraph states, quote, Upon request, UCS will grant a religious exemption for sincerely held religious beliefs and practices which prohibit a judge or employee from receiving a COVID-19 vaccine; do you see that?

A I do.

Q Is this an accurate statement of the court system's policy with respect to religious exemptions to the COVID-19 vaccine?

A It is.

Q Now, let's continue down. If we go four paragraphs down, there is a small paragraph that states, quote, UCS will carefully review all requests for religious exemptions, however, approval is not guaranteed. After your request has been reviewed and processed, you will be notified, in writing, if an exemption was been granted or denied; do you see that?

A I do.

Q So this now brings me to the big opening question, which is: Can you please describe what the process was by which the court system would review and evaluate and make a decision whether or

J. Barry

Q As part of the evaluation process, did the committee take into consideration any issues of whether granting a religious exemption for a particular committee would impose any kind of undue hardship on the court system?

MR. SIUDZINSKI: Objection. You can answer.

A No. That was not part of our process. The part of our process was exactly what I said, was the objection to the vaccination religious in nature and was it sincerely held period.

Q So in evaluating the applications along these two parameters, was it religious in nature and was it sincerely held, how did the committee go about determining whether or not an employee's expressed objection was religious in nature?

A Well, I will give some background on the supplemental form that I think is important. You didn't ask expressly about it or directly about it, but I think it needs to be part of the conversation. We very quickly, upon reviewing the first submissions that were being sent in by judges and employees, determined that most of the objections to the religious objections and the request for

J. Barry

drugs?

A Yes.

Q Here the committee is looking for specific information or specific answers to specific questions that they posed to the employee applicant; is that correct?

A That's correct.

Q Focusing now on page three of this form, were there specific answers to these questions that the committee basically required the employee to give in order to approve, or I suppose deny, the employees's request for religious exemption?

A No. There were no specific instructions that were given to committee members about this. What I would say in background is that the supplemental form was always considered in conjunction as a part of a whole with the initial form. So the committee always reviewed the answers to the supplemental form submitted by an employee or a judge with the initial form itself.

Now, what the committee was looking for in conjunction to these questions about over-the-counter drugs and prescription drugs and vaccinations that were developed or manufactured or

J. Barry

committee into two working groups, sort of divide and conquer. We determined some ground rules for those working groups and the full committee.

The first was that if we reviewed the first application, the initial application and it appeared to hold a religious, sincerely held religious belief that objected to the vaccine based on fetal stem cell use or body integrity, we agreed that, in that application, we would direct our counsel to contact the person who was requesting an exemption and direct that person to submit the supplemental form either A or B or both depending on what was contained inside that initial application.

The ground rules were that after we -- in virtually all religious exemption requests, there were a couple, I think, I couldn't tell you how many that were approved on the initial application, but if it's two, that's probably it, but I can't remember.

Virtually all of them were asked to fill out one or both of the sections of the supplemental form and the ground rules were that a working group would then review both the initial form and the supplemental form once it had been

J. Barry

submitted and would vote to recommend either approve or deny. If the working group approved it, it was approved right then and there, and counsel was instructed to notify the individual and the supervisor that the religious exemption request had been approved.

If the working group voted to recommend denial, it was then scheduled for a de novo review for the entire committee.

Q In terms of the voting process that either the subcommittee or the entire committee would go through on a particular application, I take it each member received a vote?

A Correct.

Q Was it a majority-rule approach or was it a required-consensus approach?

A We tried to get consensus but that was not required. It was majority-rule vote.

Q In your experience, how often -- in general, how often would you say there was a situation where an application would be approved based on a majority vote but there were definitely members of the committee who had voted to deny?

A It happened. I couldn't tell you the

J. Barry

in both forms, we deemed it as unresponsive.

Q So an employee makes objections that you deem to be unresponsive, does that disqualify the employee from being approved for religious exemption?

A I will tell you that in this instance, again, similarly to the previous exhibit that we went over, this individual would have appeared and I have no recollection of reviewing this individual's application and these forms, but knowing how we discuss these, this person was responsive as to Section A related to fetal stem cell lines, and it showed sincerity in the religious held beliefs against using substances with fetal stem cell lines, so we granted it based on the responses based on Section A.

Q In situations where an employee's answers to the supplemental form question were considered unresponsive by the committee, did the committee ever engage in any followup communication with that employee asking him or her to provide responsive answers to those questions?

A I don't believe so. There were instances where a person would not initial the statements in

J. Barry

number three on the initial application that I think that we asked the individual to fully complete or if they didn't notarize the application, we asked them to resubmit with a notarization, but not -- other than those, no, I don't believe so.

Q Was there -- in determining the process that the court system would go through for reviewing and evaluating employees' applications for religious exemptions, did you make a predetermination that you would not engage in any followup communications with employees about the substance of their answers to either to the supplemental form?

A We had discussed what the process and the procedures should be and the exchange of ideas between the exemption review committee and the person asking for the exemption both with our own internal counsel and our external counsel.

We also took into consideration the number of expected exemption requests that we were going to be getting in a large organization such as this and it did turn out that we received a large number of these requests. We determined that, based upon the applicable law and our understanding of the exchange of information that was required between

J. Barry

knowledge and experience as having served on the UCS committee that dealt with these applications why Ms. Bergin's initial application for religious exemption, based on what we see in Plaintiff's Exhibit 8, would not have been deemed sufficient to grant her request based on this submission alone?

A Based on my review, it looks like she was expressing concerns about bodily integrity and particularly from a letter from her pastor, I believe it was, from the International Christian Center Senior Pastor, objections related to the use of stem cells in the development of the vaccine.

In order to gauge of the sincerity of both of those beliefs, the work grouping would typically and very frequently, if not almost all the time with those two objections or concerns, request that the individual fill out the supplemental form.

Q In fact, in this case that's what happened. If we take a look at Plaintiff's Exhibit 9, please.

A Yes.

Q Before we get to Plaintiff's Exhibit 9, is it fair to say that the reason the committee would have asked Ms. Bergin to submit the supplemental

J. Barry

form was because her personal statement invoked these issues of fetal stem cells as well as the bodily integrity concept as opposed to there being something intrinsically inadequate with her initial submission to the committee?

MR. SIUDZINSKI: Objection. You can answer.

A No. I would say her initial submission was perfectly adequate and it explained a religious belief based upon a number of issues that she presents and we wanted to explore it some more.

Q So if we look now at Plaintiff's Exhibit 9, which I will describe for the record. This is an eight-page document which is comprised of a one-page cover letter and then a seven-page supplemental form and it's Bates-stamped Bergin 50 to Bergin 57.

(Plaintiff's Exhibit 9, Marked for Identification.)

BY MR. WARSHAWSKY:

Q Do you have that exhibit?

A Yes.

Q It appears that this would be another example where the committee requested more information from the applicant, in this case,

J. Barry

then for the narrative questions on Section B, she said, Please see attached, and she attached to this supplemental form a one-page statement dated November 10, 2021.

Do you see that?

A I do.

Q So we know that Ms. Bergin's application was denied and so I guess my question to you would be: What was inadequate or insufficient about her response, her statement response to the supplemental form? I will leave it at that. Let me restart.

The first question is: Based on your knowledge and experience as one of the committee members who reviewed religious exemption applications, is it your opinion that Ms. Bergin's submission and response to the request for a supplemental form was sufficient or insufficient for the committee's purposes?

A It was insufficient.

Q Why was it insufficient?

A It was not responsive.

Q In what ways did you consider her submission to be nonresponsive?

MR. SIUDZINSKI: Objection. If you know.

J. Barry

A We were looking for really just yes-or-no answers in the questions to number one, two and three. We were looking for an explanation if the answers were yes in the subsequent question.

Again, we were looking for yes-or-no answers in four, five, six, seven and eight, and if the answer to eight was no, we were looking for an explanation as to how she would square her taking one vaccine or these vaccines rather than COVID-19 vaccines.

In Section B, we were looking for answers to those specific questions. She referred us to her statement which did not address any of those particular questions, and it's a fine statement that we would have taken no objection to as an attachment to the supplemental form, but we were specifically looking for direct answers to all the questions in A and B.

Q Why didn't anybody from UCS respond to Ms. Bergin and tell her that the committee was looking for specific answers to the questions in Section A and Section B and that what she gave, while fine in and of itself, was not the information you needed to make a final decision on her

J. Barry

A Correct.

Q Are you aware of any other reason besides the nonresponsiveness of her supplemental form for why her religious exemption application was denied?

A No.

Q If we can take a look please at Exhibit 12.

(Plaintiff's Exhibit 13, Marked for Identification.)

BY MR. WARSHAWSKY:

Q Strike that. Exhibit 13. Exhibit 13, I will describe for the record. This is a six-page document. It's not Bates-stamped. It is another supplemental affidavit form from Ms. Bergin, and this one for identification purposes was notarized on the 3rd of January 2022.

Do you have Plaintiff's Exhibit 13 in front of you?

A I do.

Q Do you know whether or not this copy of Ms. Bergin's supplemental form was ever submitted to any members of the committee to review?

A I have no direct knowledge of it, but I would doubt it.

Q Why would you doubt it?