UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
JESSICA BERGIN,

Ind. No. 22-CV-5264 (BMC)

Plaintiff,

-against-

**AFFIDAVIT OF JUSTIN BARRY**

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.
-----------------------------------------------------------------------X

STATE OF NEW YORK )
)ss:
COUNTY OF NEW YORK )

JUSTIN A. BARRY, being duly sworn, deposes and says:

1. I am employed as Chief of Administration by the State of New York – Unified Court System (the "UCS") and have held that position since July 8, 2021.

2. In my role as Chief of Administration, I assist New York State Chief Judge Rowan Wilson, Chief Administrative Judge Joseph A. Zayas, and First Deputy Chief Administrative Judge Norman St. George in the operation of UCS. My responsibilities include developing protocols and procedures to ensure that the UCS is a safe and accessible forum to both the public and UCS employees all over New York State.

3. These responsibilities directly support UCS's core mission of ensuring meaningful access to justice for the millions of litigants who use the court system. Many, if not most, public users of the court system--criminal defendants, civil litigants, and prospective jurors--are there involuntarily and, in many cases, under direct compulsion by the State. Our commitment to make the court system accessible requires that we take all appropriate steps to ensure the safest and healthiest environment possible for the many individuals who need to access the legal system, as

well as the judicial and non-judicial employees of UCS.

4. The UCS is comprised of approximately 220 buildings spread throughout each of New York's 62 counties and currently employs approximately 16,200 judicial and non-judicial staff with a statewide annual budget of $3.4 billion for the fiscal year of 2023-2024.

5. I am submitting this affidavit in support of UCS's motion for summary judgment and in opposition to plaintiff's proposed motion for summary judgment. I have personal knowledge of the facts set forth in this affidavit.

***My Prior Affirmations Regarding UCS and UCS's Former Vaccination Policy***

6. In October 2021, in an action brought by various UCS employee unions in the Supreme Court of the State of New York, County of Albany, challenging UCS's mandatory COVID-19 vaccination policy (the "Vaccination Policy"), I submitted an Affirmation and Supplemental Affirmation that described: (i) UCS; (ii) UCS's return to in-person operations after such operations were suspended due to COVID-19; (iii) UCS's efforts to respond to COVID-19; (iv) the implementation of UCS's Vaccination Policy; and (v) the significant strides that the Vaccination Policy has enabled UCS to make in returning full operational capacity.

7. In February 2022, in an action brought by various UCS employees in the United States District Court, Northern District of New York, challenging UCS's mandatory COVID-19 vaccination policy (the "Vaccination Policy"), I submitted a Declaration that described: (i) UCS; (ii) UCS's return to in-person operations after such operations were suspended due to COVID-19; (iii) UCS's efforts to respond to COVID-19; (iv) the implementation of UCS's Vaccination Policy; and (v) the significant strides that the Vaccination Policy has enabled UCS to make in returning full operational capacity.

8. In March 2022, in an action brought by various UCS employees in the Supreme

Court of the State of New York, County of Steuben, challenging UCS's mandatory COVID-19 vaccination policy (the "Vaccination Policy"), I submitted an Affirmation that described: (i) UCS; (ii) UCS's return to in-person operations after such operations were suspended due to COVID-19; (iii) UCS's efforts to respond to COVID-19; (iv) the implementation of UCS's Vaccination Policy; and (v) the significant strides that the Vaccination Policy has enabled UCS to make in returning full operational capacity.

9. In April 2022, in an action brought by various UCS employees inthe Supreme Court of the State of New York, County of Rockland, challenging UCS's mandatory COVID-19 vaccination policy , I submitted an Affirmation that described: (i) UCS; (ii) UCS's return to in-person operations after such operations were suspended due to COVID-19; (iii) UCS's efforts to respond to COVID-19; (iv) the implementation of UCS's Vaccination Policy; and (v) the significant strides that the Vaccination Policy has enabled UCS to make in returning full operational capacity.

10. On June 1, 2023, I provided testimony in the present action pertaining to (i) UCS; (ii) UCS's efforts to respond to COVID-19; (iii) the implementation of UCS's COVID-19 Vaccination Policy; (iv) the process by which medical and religious exemption requests to UCS's COVID-19 Vaccination Policy was developed; (v) the process by which religious exemption requests to UCS's COVID-19 Vaccination Policy were reviewed and determined; and (vi) a review of plaintiff's religious exemption submissions and submissions of other religious exemption requests that were granted exemptions.

11. I reaffirm my statements in those affirmations and incorporate them by reference as if fully set forth below.

***The COVID-19 Pandemic and the Impact on UCS Operations***

12. Over the course of the COVID-19 pandemic, UCS had taken a series of carefully considered steps designed to protect the health and safety of court employees and the public. On March 11, 2020, then-Chief Judge Janet DiFiore, after considering the substantial adverse health consequences caused by the outbreak of COVID-19, and in consultation with senior UCS executives in light of guidance issued by governmental and other health experts, promulgated an Administrative Order that instituted restrictions on who could enter any UCS courthouse in certain counties until further notice.

13. In the days that followed, Judge DiFiore issued successively more restrictive orders to combat the spread of COVID-19 and to protect the health and safety of UCS workforce and court users. On March 13, 2020, then Chief Administrative Judge Lawrence K. Marks, with the approval of Chief Judge DiFiore, postponed jury trial matters until further notice and, effective March 16, 2020, suspended in-person operations of high traffic civil parts, and ordered all conferences, meetings, and other proceedings to occur telephonically or over videoconference. Effective March 16, 2020, UCS postponed all non-essential functions of the courts until further notice and limited and consolidated its essential functions in every court within UCS. Throughout March 2020, the courts began conducting proceedings by video whenever possible.

14. On March 23, 2020, Judge Marks, with the approval of Chief Judge DiFiore, issued another order directing that non-essential filings would no longer be accepted by UCS, consistent with former Governor Andrew Cuomo's executive order suspending statutes of limitation in legal matters. On March 25, 2020, New York City Criminal Courts began to hold all arraignments by videoconference. The next day, New York City Family Court began conducting all essential matters by telephone and videoconference in order to mitigate and contain the ongoing spread of

COVID-19, while at the same time continuing to provide critical emergency relief to families children seeking court services.

15. UCS, as the judicial branch of New York State's government, has obligations under the United States Constitution and New York State Constitution to provide open and accessible public forums for citizens to resolve legal disputes and to protect their legal and civil rights. UCS takes these obligations seriously and endeavored at all times during the COVID-19 pandemic to maintain, to the greatest extent possible, full court operations.

16. While UCS endeavored to limit in-person activities as much as possible, it had to maintain some essential operations in person. For instance, the State's Special Response Team, working with officers from its Department of Public Safety, distributed protective gear to courthouses throughout UCS to protect court personnel and staff including judges and non-judicial personnel of UCS, who continued to work in the courthouses and keep the State's judicial system operational during the pandemic.

17. UCS continued to institute a variety of temporary emergency measures to deliver essential justice services through the pandemic while keeping court personnel and litigants safe. To ensure continued access to the courts while prioritizing the health and safety of UCS judges and staff, court users, and the public, UCS implemented a series of unprecedented temporary measures. We placed restrictions on courthouse entry by at-risk persons, consolidated essential matters in a limited number of designated court parts, and implemented a statewide transition to virtual court operations in order to eliminate person-to-person contact in court proceedings and to minimize courthouse traffic.

18. By April 13, 2020, UCS had virtual courts up and running statewide allowing essential and emergency court proceedings to be conducted remotely. A very small number of

court clerks and court officers continued to staff virtual court parts to process critical paperwork and provide essential security.

19. Although necessary to alleviate pressures created by the pandemic, moving court proceedings online presented serious challenges, affecting the public's access to justice and particularly criminal defendants' access to counsel, creating a potential for constitutional violations and worse outcomes for defendants. The complete halt of jury trials also had negative consequences, particularly in criminal matters but also in civil matters with jury trial rights.

20. The judicial and non-judicial personnel of UCS had to implement regulatory, structural, technological, and other innovations, and propose practical reforms to deliver justice through these new formats, facing issues such as how to allow counsel to confer confidentially with their clients or have sidebars with judges and also how to ensure that criminal defendants understood the proceedings and implications of any plea or other case development to protect their due process rights. UCS had to figure out a way to ensure that the most marginalized users of the court system—whether criminal defendants, disabled persons, litigants requiring interpretative services, plaintiffs in lawsuits, litigants in family court, or renters fighting eviction—had access to virtual proceedings.

21. UCS began to handle an increasing volume of essential and emergency matters remotely and added virtual courtrooms to manage the growing demand and needs of the public. Between April 13 and April 30 alone, the court conducted conference and other court proceedings in over 25,000 cases, one third of which were settled or otherwise disposed. UCS was awash in a backlog of undecided matters and braced for what promised to be a surge of new litigation once the court system started allowing new filings and returned to more normal operations. To date, more than three years later, the backlog of matters has not been fully alleviated.

22. In May 2020, then Chief Judge DiFiore and Chief Administrative Judge Marks announced that courthouses in New York State would return to modified in-person staffing in anticipation of a return to expanded in-person operations.

23. Returning UCS to in-person service presented extraordinary challenges. UCS's infrastructure, a total of 220 buildings, ranges from buildings erected as early as 1903 to those built in the last few years. Because UCS is merely a tenant in all the buildings it occupies, overseeing the upgrade of the HVAC systems to the ratings necessary to protect court employees and users took time and much effort. Additionally, the pandemic created ongoing staffing difficulties due to employees' reasonable fears of returning to in-person operations when, at the time, no proven guidelines existed on limiting the spread and their need to stay home for extended absences to care for themselves and family members after contracting or being exposed to COVID-19.

24. We nonetheless worked diligently to address these issues and to keep everyone as safe as possible when working in or visiting the numerous UCS buildings throughout the State. In planning for a return to in-person operations, UCS closely followed and heavily relied on guidance issued by the CDC and the New York State Department of Health (the "DOH"), and implemented protocols designed to mitigate the risk of COVID-19 transmission. To that end, UCS mandated mask-wearing, imposed social distancing rules, regularly disinfected surfaces, and accommodated requests for remote proceedings when possible. UCS also implemented a reporting system that inventoried that number of individuals who either worked in or had recently visited UCS court facilities and tested positive for COVID-19.

25. With progress having been made in the wide distribution of COVID-19 vaccinations and a downturn in infection rates, then Chief Judge DiFiore announced on May 13, 2021 that UCS would implement a return to 100% on-site staffing.

26. With the return of on-site staffing UCS made a commitment to increase the amount of in-person court appearances, particularly trials. UCS went from conducting three criminal jury trials in January of 2021 to 108 in May of 2021. There was also a renewed focus on addressing pending caseloads and reducing case backlogs. For instance, superior criminal courts throughout the State pending caseloads rose from 13,228 at the beginning of the pandemic to 19,832 in Term 9 of 2021. With the uptick in jury trials being conducted, these numbers were only a fraction of the number of trials that UCS conducted in 2019. UCS found that it was becoming extremely difficult to impanel juries due to social distancing guidelines and jurors who refused to be seated due to the potential risk of contracting COVID-19.

27. Despite UCS's best efforts, we obviously could not eliminate all COVID-19 associated risks. Based on the CDC's and the DOH's guidance, we concluded that our best hope for return to a safe and near-normal state of operations was the development and widespread use of safe and effective vaccines.

28. With the rollout of the COVID-19 vaccine in early 2021, UCS began implementing new policies to encourage its employees to get vaccinated. A policy we initially developed on August 18, 2021, the Revised Mask Policy Program, enabled UCS employees who were vaccinated to stop wearing their masks inside buildings. Before that policy was implemented, UCS had no way of determining or tracking how many judges and employees were vaccinated. Shortly after its implementation and, with it, the start of our ability to track the number of vaccinated judges and employees, the percentage of judges and employees reporting vaccination through the system was only about 30%. With encouragement from administrators and incentives for employees such as compensatory time offered for vaccinations, the percentage increased significantly, but there was still a significant percentage of judges and employees who did not

report vaccination.

29. In early 2021 we hoped that the pandemic was beginning to run its course and that "regular life" would resume in short order. In the spring and early summer 2021, we saw few, if any, cases and the news we were seeing from the CDC, DOH, and other governmental authorities was strongly encouraging.

30. Unfortunately, by July 2021 infection rates increased dramatically as a result of the "Delta" variant which was reflected in the amount of positive cases among judges, employees, and other court users that we were tracking. We went from week-long periods in June 2021 of no positive cases each day to periods where we were seeing between six and ten cases a days. Although some vaccinated individuals did contract COVID-19, they routinely had better outcomes than those who were not vaccinated, consistent with what public health experts have stated is ordinarily the case.

31. In light of this, we decided further steps were critical to ensure the health and safety of UCS employees and the many members of the public who needed access to the courts especially those who themselves could not be vaccinated. At the same time, UCS was seeking to increase operations to achieve pre-COVID-19 capacity for criminal trials while also complying with guidance from the CDC and DOH.

***UCS's COVID-19 Vaccination Policy***

32. Throughout the COVID-19 pandemic, UCS had sought to follow the guidance of trusted public health authorities in order to fulfill its mission of providing safe court operations under unprecedented, difficult, and variable circumstances. To that end, and consistent with public health authority guidance, from January 2021 until February 2023. When the vaccines became available to UCS employees in January 2021, UCS had consistently encouraged its

employees to receive the vaccinations in order to restart in-person operations and maintain a safe environment for judges, non-judicial employees, and court users.

33. After careful consideration of the available public health guidance at the time, including information about the safety of the vaccines, UCS determined that the most important element of its strategy to restart in-person operations while maintaining a safe environment for judges, non-judicial employees and court users was to implement the widespread use of what public health authorities and medical experts have determined are safe and effective vaccines among all of its employees.

34. Developing the policy was a monumental task that required consultation with UCS administrators, judges, in-house counsel, administrative staff, and outside counsel (Paul, Weiss, Rifkind, Wharton, & Garrison, LLP) hired to consult in the creation of the policy itself, and developing exemption forms that needed to contain simple and easy-to-understand instructions for the applications. The hiring of Paul Weiss was a significant financial burden.

35. After extensive preparation in the weeks leading up to the announcement of the policy, on September 10, 2021, UCS announced that it would implement a COVID-19 vaccination policy requiring all Judges and non-judicial personnel to receive a vaccination against COVID-19 unless they applied for and were granted a medical or religious exemption. The memorandum announcing the Vaccination Policy that was sent to all Judges and non-judicial personnel provided a copy of a blank religious or medical exemption request. For religious exemption requests, the memorandum provided an initial submission deadline of September 27, 2021. That deadline was then extended to October 18, 2021 due to litigation commenced by the Civil Service Employees Association challenging the policy. In addition to the creation of the Vaccination Policy itself, UCS created and implemented the process by which in UCS was to review medical and religious

exemption requests. In consultation with outside counsel, the UCS developed the Vaccine Exemption Review Committee ("VEC") which was comprised of 11 senior administrators who were tasked with reviewing the submissions.

36. The VEC had 11 voting members, comprised of UCS executive staff. In addition to myself, the VEC included the following individuals:

a. Nancy Barry, UCS Chief of Operations. As Chief of Operations for UCS, Ms. Barry is responsible for the oversight, management, and policy development and implementation for the Office of Court Administration and its divisions.

b. Dan Weitz, Director, OCA Division of Professional and Court Services ("DPCS"). As Director of OCA's Division of Professional and Court Services, Mr. Weitz is responsible for the oversight, management, and policy development and implementation pertaining to various offices within DPCS such as, grants and contracts, the ADA unit, the Children's Centers Program, Continuing Legal Education, Guardian Assistance Network, Language Access, Legal Information, Parent Education and Awareness Program, Records Management and Trial Court Support.

c. John Sullivan, UCS Statewide Americans with Disabilities Act Coordinator. As the Statewide ADA Coordinator, Mr. Sullivan is responsible for oversight over all services, programs and activities that assists in ensuring access to court services and programs for court users with disabilities in compliance with the Americans with Disabilities Act.

d. Shawn Kerby, Assistant Deputy Counsel for Labor Relations. As Assistant Deputy Counsel for Labor Relations, Ms. Kerby is responsible for providing legal counsel

to the Office of Labor Relations regarding the Civil Service Law, Labor Law, and assisting the Director of Labor Relations in negotiating various collective bargaining agreements for all twelve of the unions that represent non-judicial personnel across the state.

e. Scott Murphy, Chief of Staff for the Deputy Chief Administrative Judge ("DCAJ") for Courts Outside of New York City. As Chief of Staff for the DCAJ for Courts Outside of New York City, Mr. Murphy is responsible for developing policies and procedures related to court operations, special projects, and administrative functions for courts in 57 of 62 counties (those other than NYC) in the state. Mr. Murphy is also responsible for providing managerial assistance to staff members, court employees, and other administrative department personnel, managing budget preparation, and. program management.

f. Jennifer DiLallo, Deputy Chief of Staff for the DCAJ for Courts Outside of New York City. As Deputy Chief of Staff for the DCAJ for Courts Outside of New York City, Ms. DiLallo is responsible for assisting the Chief of Staff and the DCAJ in developing policies and procedures related to court operations, special projects, and administrative functions for courts in 57 of 62 counties in the state. Ms. DiLallo is also responsible for providing managerial assistance to staff members, court employees, and other administrative department personnel, managing budget preparation, and. program management.

g. Linda Dunlap-Miller, Chief of Staff for the DCAJ for the New York City Courts. As Chief of Staff for the DCAJ for Courts Outside of New York City, Ms. Dunlap-Miller is responsible for developing policies and procedures related to court

operations, special projects, and administrative functions for courts in the five boroughs (counties) of New York City. Ms. Dunlap-Miller is also responsible for providing managerial assistance to staff members, court employees, and other administrative department personnel, managing budget preparation, and. program management.

h. Keith Miller, Principal Management Analyst for OCA's Division of Human Resources, Judiciary Benefits. As Principal Management Analyst for OCA's Division of Human Resources, Judiciary Benefits, Mr. Miller is responsible to the for management, oversight, and administration of UCS's employee benefits such as medical, dental and vision, commuter benefits, deferred compensation, workers' compensation, work-life assistance programs, flex spending accounts, and life insurance.

i. Michelle Smith, Chief of Staff for the Office of Justice Initiatives ("OJI"). As Chief of Staff for the OJI, Ms. Smith is responsible for oversight, management, and policy development over the OJI's subdivisions which include, Equal Justice in the Courts, Access to Justice, Youth and Emerging Adult Justice, Child Welfare and Family Justice, Policy and Planning, Judiciary Civil Legal Services, and Diversity and Inclusion. OJI is responsible for providing oversight and management over various justice-based initiatives to ensure meaningful access to justice for all court users of civil, criminal and family court across the state.

j. Rosemary Martinez-Borges, Deputy Chief of Staff for the OJI. As Deputy Chief of Staff for the OJI, Ms. Martinez-Borges responsible for assisting the Chief of Staff in oversight, management, and policy development over the OJI's subdivisions

which include, Equal Justice in the Courts, Access to Justice, Youth and Emerging Adult Justice, Child Welfare and Family Justice, Policy and Planning, Judiciary Civil Legal Services, and Diversity and Inclusion. OJI is responsible for providing oversight and management over various justice-based initiatives to ensure meaningful access to justice for all court users of civil, criminal and family court across the state.

37. The VEC voting members had diverse backgrounds and expertise, with a mix of executive, human resources, management, and legal experience, including knowledge of state and federal civil rights statutes such as Title VII and the Americans with Disabilities Act.

38. In addition to the above voting members, the VEC also included Mindy Jeng, who acted as counsel to the VEC. Ms. Jeng was a non-voting member and her duties included advising VEC members of logistical and legal matters, oversight of the process for employees to submit applications and the effort to redact the exemption requests, as well as oversight over the review process. Ms. Jeng's responsibilities as counsel to the VEC is discussed in more detail in Mindy Jeng's Declaration submitted in support of UCS's motion for summary judgment.

39. Sharing in responsibilities in providing legal counsel to the VEC was Anthony R. Perri, Deputy Counsel for Criminal Justice. Mr. Perri was also a non-voting member and his duties included advising VEC members of legal matters and oversight of the process for employees to submit applications. Mr. Perri also attended the weekly meetings of VEC members who were discussing and voting on exemptions and was the point of contact between UCS and the outside counsel that UCS hired for development and implementation of the Vaccination Policy (Paul Weiss. Aside from his work with the VEC, as Deputy Counsel for Criminal Justice, Mr. Perri's full-time responsibilities include liaising with and advising UCS criminal court staff on legal and

policy matters related to criminal actions.

40. As UCS began to receive and review religious exemption requests, it became apparent to the VEC that the majority of applicants gave one or both of the following reasons for not wanting to get the COVID-19 vaccination: (1) the applicant expressed a concern about the connection between fetal stem cells and the development of the COVID-19 vaccine; and/or (2) the applicant expressed a concern about the sanctity or purity of his or her own body.

41. The VEC was tasked with reviewing the exemption requests also found that, in many cases, the applicants' personal statements did not provide sufficient information to adequately address the applicant's opposition to receiving the COVID-19 vaccination was based upon a religious belief, based upon a philosophical belief, based upon concern for the safety and efficacy of the available COVID-19 vaccines, and whether the applicant adhered to his or her belief consistently in regard to other vaccines and medical treatments, or just in regard to the COVID-19 vaccine.

42. In response to the above outlined concerns of the VEC in reviewing the requests, UCS—in consultation with its' outside counsel—developed a supplemental form to obtain additional information from applicants to be able consider an applicant's stated basis for requesting a religious exemption. The supplemental form contained two sections which invited the applicant to provide further information regarding his or her beliefs. The first section ("Section A") asked the applicant to review and acknowledge information regarding the COVID-19 vaccines and the HEK-293 fetal stem cell line which was used in the development of the COVID-19 mRNA vaccines. Section A also asked applicants about their prior, current, and future use of specific prescription and over-the-counter drugs and vaccines that also used the HEK-198 cell line in its development or testing. The second section ("Section B") requested further information from the

applicant regarding their beliefs about the sanctity or purity of his or her own body.

43. The vast majority of applicants who sought a religious exemption (other than a small handful) were asked to complete either Section A or B or both sections of the supplemental form based upon the information they provided in the initial request. Those who were asked to complete the supplemental form professed to have a variety of religious beliefs and practices. UCS's COVID-19 vaccination policy for its employees was essential at the time to minimize the spread of COVID-19 throughout UCS courtrooms and its facilities, thereby protecting the safety of UCS employees and the public, avoiding shortages of essential staff members due to COVID-19 related illness and quarantine periods, and enabling UCS to maintain an accessible forum for justice in accordance with its core mission. As a result of the policy approximately 93% of UCS employees were vaccinated.

44. In response to UCS's policy, over 1,200 judges and non-judicial staff applied for exemptions. Of that 1,200, approximately 1,000 were based on religious grounds. UCS granted approximately 536 of UCS employees who sought a religious exemption and denied approximately 363 such requests.

45. Of those 363 employees who were denied exemptions, in March 2022, UCS determined that 103 employees were not in compliance with its Vaccination Policy because they had not been vaccinated. The other 260 employees either became vaccinated, obtained medical-based exemptions, quit, or retired from service after their requests were denied. Effective April 7, 2022, UCS terminated the employment of the 103 non-compliant employees. Plaintiff was one of the 103 employees.

***The Exemption Review Process***

46. The VEC that was set up to review religious exemption requests were divided

into two working groups (Working Group A and Working Group B) to review the hundreds of exemption requests UCS received. The application forms were divided between the two working groups for initial review. A quorum of at least three working group members was required at each review meeting. UCS's in-house counsel attended the meetings of both working groups. A majority of the working group memberspresent at a meeting was required to grant or deny an application.

47. If one of the working groups voted to deny an application, the application went to the full VEC for further review. A religious supplemental application, read together with the original submission, was denied only if a majority of a quorum of the full VEC agreed with the working group that it should be denied. (A quorum for a full VEC meeting was five members.) Employees whose exemption requests were then granted by the VEC were notified of the approved exemption and were then required to submit proof of weekly COVID tests and continuing to wear a mask and engage in social distancing while at work—the same as those with medical exemptions.

48. Both the full VEC and the working groups adopted a "blind" review process, which means that the identity of the exemption applicant and all identifying informationwere redacted from the forms presented to the working groups and the VEC before they were reviewed. Neither the working groups nor the any member of the VEC ever personally spoke with or asked any of the exemption applicants about their applications, and all applications were, and continue to be, kept confidential.

49. In sum, for the vast majority of submissions, there were three levels of review before a religious exemption request can be denied (initial and supplemental working group review, and full VEC review); all reviews are done on a "blind" basis; and the review was solely to determine whether the applicant's opposition to being vaccinated was based on a sincerely held

religious belief. Applications were not denied based on what their belief is or the source of the belief, or whether the applicant identifies with one particular religion or another. UCS granted exemptions to employees professing adherence to a wide variety of religious beliefs and faiths. The VEC did not in any way seek to assess the validity of any employee's professed religious beliefs, including Plaintiff's.

50. If an application for a religious exemption is denied, the VEC sent the applicant a notice stating that his or her request was denied and explaining that the applicant must submit proof of the first dose of a COVID-19 vaccination within 10 calendar days.

51. If a UCS employee who was denied an exemption (religious or medical) failed to be vaccinated by the deadline provided, the employee's supervisor would contact the employee and give notice to them that they must obtain proof of vaccination by the close of business on the following day. If an employee did not submit proof of vaccination by the close of business on the following day, the employee was then notified they were deemed "unfit for duty." The declaration of an employee being deemed "unfit for duty" was a term of art that meant that employee could not report for work until they upload proof of being vaccinated. Once an employee was deemed "unfit for duty" and continued to be out of compliance with the Vaccination Policy, the employee was required to stay home and charge the time against his or her accrued compensatory time and/or annual leave until their leave was exhausted. After that, the employee was placed on "lost time," which meant that they were no longer being paid, but they continued to receive benefits, including health insurance, until notified by the New York Civil Service Commission that they were required to pay the full amount of their health insurance benefit.

52. Effective April 7, 2022 UCS terminated the employment of all the 103 employees who had been denied exemptions and remained compliant with the Vaccination Policy, including

Plaintiff.

***Plaintiff's Applications for a Religious Exemption***

53. UCS's and Plaintiff's prior submissions to the Court contain copies of her application for a religious exemption.

54. As her submissions show, on September 27, 2021, Plaintiff submitted a request for a religious exemption to the COVID-19 vaccination.

55. On November 8, 2021, Plaintiff was asked to submit the supplemental form. The request stated that plaintiff was required to submit a completed supplemental form on or before November 22, 2021. On November 16, 2021, Plaintiff submitted her supplemental form.

56. On December 29, 2021, UCS notified Plaintiff that her exemption request was denied and she was directed to submit proof of vaccination on or before January 10, 2022.

57. On January 3, 2022, Plaintiff submitted a second supplemental request. However, all determinations made by the VEC were final. Plaintiff's second submission was not considered by the VEC.

***UCS's Vaccination Policy Submission Deadlines***

58. When UCS announced that it was going to implement the Vaccination Policy on September 10, 2021, the memorandum outlining the policy stated that all judges and non-judicial employees were required to receive a vaccination to COVID-19 on or before September 27, 2021. The policy also stated that any non-judicial employee or judge who wanted to seek a religious or medical exemption to the COVID-19 vaccination must submit his or her exemption request on or before September 27, 2021. That deadline was later extended to October 18, 2021 due to litigation that was commenced by several unions representing UCS employees. The policy explicitly stated that, "no exemption requests will be considered unless they are fully completed on the appropriate

form and filed through the portal." (ECF #13-1, UCS Ex. A).

59. The memorandum further stated that, "employees submitting an exemption application will be notified…that more information is needed in order to consider the employee's request for an exemption…." (ECF #13-1, UCS Ex. A).

60. The memorandum further stated that the non-compliance "may result in disciplinary action, up to and including termination." The religious exemption form also states, "if a judge or employee refuses to provide the information necessary for UCS to review and consider their request for religious exemption, they will be required to comply with UCS COVID-19 Vaccination mandate." The form states again that "incomplete submissions will not be reviewed…" (ECF #13-1, UCS Ex. A).

61. As to the supplemental form, the instructions explicitly stated, "if a judge or employee refuses to provide the information requested in the supplemental form necessary for UCS to review and consider their request, they will be required to comply with UCS COVID-19 Vaccination mandate." (ECF #13-1, UCS Ex. A).

62. The supplemental form further informed the applicant that "the decision is final and not subject to internal appeal." (ECF #13-1, UCS Ex. A).

63. UCS implemented firm deadlines to ensure a swift and orderly process in reviewing exemption requests and notifying applicants of a decision. At the time UCS implemented the Vaccination Policy, UCS was focused on resuming in-person public access to the courts in an effort to ensure that the rights of litigants in both civil and criminal proceedings were not further impacted by any delays caused by COVID-19.

64. The vast majority of employees complied with the given deadlines, and none of the UCS employee unions challenged them or requested extensions on behalf of their members.

65. In addition to UCS's focus on resuming in-person court operations, UCS also accounted for the possibility that a substantial number of the more than 16,000 persons employed with UCS across New York State would seek an exemption to the COVID-19 vaccination policy. Indeed, that possibility became a reality when UCS received approximately 1,200 UCS employees (approximately 7.5% of the total UCS workforce) sought exemptions from UCS's vaccination policy on either medical or religious grounds.

66. As a member of the VEC, I was required to review approximately 50 applications per week from October 2021 through December 2021. My own personal review of the applications took approximately 7 hours per week. I then attended weekly meetings to discuss the applications and vote whether to grant or deny an application. These meetings would usually last from one to two hours. Based on my knowledge and conversations with other VEC members, I believe each of them devoted similar amounts of time in addition to their regular duties.

67. In addition to the weekly meetings to vote upon an exemption request, I attended meetings to vote on exemption requests that a working group had voted to deny. When a working group voted to deny an exemption request, the full VEC then reviewed the request, and a quorum of voting members was required to discuss the application and submit a final vote on whether to grant or deny the request. When I was asked to attend a meeting to vote upon the request, these meetings would typically last one to two hours.

68. Like all of the other members of the VEC, the duties of my participation on the VEC were in addition to my duties as Chief of Administration of the UCS. As Chief of Administration, my main responsibilities include oversight of each division of the OCA (the administrative arm of UCS) including, but not limited to, Human Resources, Financial Management, Technology, Court Operations, Administrative Services, Public Safety,

Communications, Public Affairs, and Court Facilities. In furtherance of my oversight responsibilities on the above divisions, I develop policies and procedures for management of the OCA.

69. On a daily basis, my responsibilities include, but are not limited to, preparing and reviewing program proposals, standards, reports and policy directives, reviewing and approving personnel and financial transactions involving significant policy decisions, developing priorities and policies for the OCA, screening and hiring candidates for management positions within the OCA, and managing and evaluating the work of all of the aforementioned divisions of the OCA.

70. In addition to my daily duties as described above, throughout the relevant time period in the Fall of 2021, during which the majority of exemption requests were received and reviewed, UCS was attempting to bring all UCS courthouses and facilities across New York back to full in-person operations, coordinate the effort to develop the testing process for employees granted an exemption request, another task in which I, and many of the VEC members, had full involvement in.

71. Thus, it was imperative that UCS implement a policy that explicitly articulated to both judges and non-judicial employees the need for timely compliance with the application deadlines to ensure that the process for reviewing employee requests proceeded in as quick of a manner as possible so that courts could begin to resume in-person operations and the voting members of the VEC – many of whom were also responsible for orchestrating the effort to resume in-person operations across the state as quickly and seamlessly as possible – could resume their regular duties.

72. Like all of the other VEC members, my work on the VEC became a priority over my duties as Chief of Administration in order to address each application I reviewed in a timely

manner. Simply because I participated on the VEC did not mean that my other work was put on hold. Instead, I had to manage addressing the needs of the judicial branch of the New York government with my responsibilities in reviewing exemption requests. The needs of UCS did not stop because of my participation on the VEC. Rather, I—like all of the VEC members—had to juggle two full-time positions, both of which were a significant burden on each of the members' time and attention, and equally important to UCS's operations. As stated above, this period was particularly difficult for myself and other members of UCS administration because UCS was in the process of resuming full in-person operations at each of the 220 UCS courthouses and facilities across the state in a safe manner, consistent with the rapidly changing CDC guidance on curbing the spread of COVID-19.

73. Due to the burdensome nature of having to review hundreds of medical and religious exemption requests in response to Vaccination Policy, it became clear to UCS that this process needed to be performed and completed in an orderly and timely manner as the first step in opening the UCS courthouses to full in-person operations. Accordingly, UCS needed to impose strict deadlines to prevent employees from submitting an endless amount of inquiries, late requests, and "appeals" of denials which would have required the VEC to dedicate an arduous amount of time away from their regular daily duties to review and meet to discuss the repeated submissions. Indeed, UCS's assumption that this process would be burdensome came to fruition when it received 1,200 exemption requests, 960 of which required a multi-step review process, requiring the each of the members of the VEC to dedicate approximately 7 hours per week for over twelve weeks to reviewing and discussing exemption requests.

74. The imposition of strict deadlines upon employees seeking an exemption was also one of the only ways in which UCS could prevent employees from plagiarizing their colleagues

who were granted exemptions. Early on, it was apparent to the VEC that many employees were submitting identical form letters from various religious organizations in support of their requests. It was clear that employees were discussing amongst themselves what to include in the forms in order to receive a favorable determination. UCS wanted its employees to provide honest, independent statements articulating their religious beliefs, it did not want employees submitting identical requests to "game the system." UCS reasonably believed that imposing strict deadlines for submissions and declining to allow appeals of denials not only furthered the goal of returning to full in-person operations, but also to prevent widespread abuse of the exemption process.

75. The VEC was not limited in reviewing only religious exemption requests. The VEC also considered and reviewed exemption requests based on documented medical needs. Unlike medical exemption requests, however, employees seeking a religious exemption were not required to submit supporting documents to verify their religious beliefs.[1] As a result, in reviewing requests for religious exemptions, the VEC was not evaluating the sincerity of an employee's stated religious beliefs but was assessing the consistency of his or her statements. If an employee provided a statement that did not make it clear to the VEC that the objection was religious in nature, the VEC was unable to make a determination and either required additional information to help inform the VEC of the basis for the objection or were denied because the employee simply did not provide the information asked of him or her.

76. Employees whose exemption requests were granted were notified of the approved exemption. In order to maintain the exemption, the employee was then required to submit proof

[1] Although it was not required of an employee to submit any documents to support his or her request for a religious exemption, the Vaccination Policy memo invited and encouraged employees to submit any documents they deemed necessary to assist UCS in evaluating a request. No requests for a religious exemption were denied because an applicant declined to submit supporting documents. In contrast, if an employee failed to provide responses to the forms' questions, the VEC denied the request on the basis that it did not have sufficient information to make an informed determination.

of a weekly COVID test (whether the application was granted on religious or medical grounds). Each employee was provided with 1 hour of paid leave time to be tested until UCS ended its vaccination policy on February 15, 2023. During the relevant period, approximately 694 employees required testing for approximately 57 weeks (January 10, 2022 to February 15, 2023). In total, approximately 39,500 paid hours were provided by UCS to employees who required testing. In addition to paying employees for this leave, in some circumstances other employees were paid overtime to cover the exempt employees or fewer tasks were completed each week. Accordingly, accommodating employees to be able to be tested on a weekly basis was a significant burden on the UCS's resources and personnel.

77. As a result of its exemption process, UCS was able to begin reopening all 220 of its courthouses and facilities to the public for in-person operations. UCS's vaccination policy compliance resulted in a 93% vaccination rate and only 103 employees were terminated for non-compliance with the policy.

78. Looking prospectively and in preparation for likely future public health emergencies, it is essential that UCS be able to implement a similar policy such as the one implemented in response to COVID-19. It is imperative that UCS be able to implement policies, such as the Vaccination Policy, in response to any future public health emergencies so as to mitigate any potential impacts such emergencies may have on the rights of the public who use UCS's facilities and the duty of UCS to keep its' judicial and non-judicial staff safe. Due to the size and diversity of UCS's workforce and the urgency in which public health emergencies need to be responded to, it would be untenable to implement a policy that allows for multiple extensions and appeals for individual applicants for an exemption. If UCS were to implement a policy that allows for addressing hundreds of requests for extensions and appeals it would potentially require

the need to hire and train additional staff just for the purposes of reviewing and engaging in a one-on-one interactive processes for every applicant who seeks an exemption. It would not be possible to assemble a committee of UCS and OCA executive officers, like the VEC, for a policy that requires addressing and engaging one-on-one with hundreds of applicants.

***The End of the Vaccination Policy and Reinstatement of Employees Terminated Due to Non-Compliance with the Vaccination Policy***

79. On February 15, 2023, UCS rescinded its vaccination policy and as of that date, no longer required judges and non-judicial employees to be vaccinated against COVID-19. The recission of the policy also meant that those who were granted exemptions were no longer required to test weekly for COVID-19 and report those results.

80. At the time UCS announced that it was rescinding the vaccination policy UCS also announced that it would allow any employee who was terminated as a result of non-compliance to seek reinstatement beginning on February 17, 2023. On April 20, 2023, the UCS distributed a letter to all previously terminated employees stating that the employee was eligible to seek reinstatement. The letter provided a blank reinstatement request and invited the employee to fill out the request and submit it to UCS. As of the date of this Affidavit, approximately 79 employees have been reinstated.

81. Plaintiff submitted a reinstatement request which was received by UCS on May 25, 2023. On June 22, 2023 Plaintiff was reinstated to her position of Court Officer at the Richmond County Criminal Courthouse.

Dated: July 28, 2023

Justin A. Barry

Sworn to before me this
28th day of July, 2023

Notary Public

LISA NAZIA HANIFF
Notary Public, State of New York
No. 01HA6348480
Qualified in Queens County
Commission Expires September 26, 2026