UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------X
JESSICA BERGIN,

Plaintiff,

Ind. No. 22-CV-5264 (BMC)

-against-

NEW YORK STATE UNIFIED COURT SYSTEM,

Defendant.
---------------------------------------------------------------------X

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

DAVID NOCENTI
Counsel
Office of Court Administration

Attorney for UCS
25 Beaver Street
New York, New York 10004
(212) 428-2150

MICHAEL J. SIUDZINSKI
Assistant Deputy Counsel
Of Counsel

ROBYN L. ROTHMAN
Associate Counsel
Of Counsel

TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................................ iii

Preliminary Statement ........................................................................................ 1

Statement of the Case ........................................................................................ 1

Background ........................................................................................ 1

A. Plaintiff's Employment with UCS ........................................................................................ 1

B. Plaintiff's Request for a Religious Exemption to the Vaccine ............................. 2

C. Plaintiff's Seperation from Service with UCS and Reinstatement ........................ 4

Summary Judgment Standard of Review ........................................................................................ 5

ARGUMENT ........................................................................................ 6

I. PLAINTIFF CANNOT DEMONSTRATE THAT UCS OR ITS EMPLOYEES HAD A MOTIVE TO AVOID PROVIDING AN ACCOMODATION TO HER RELIGIOUS PRACTICES ........................................................................................ 6

II. PLAINTIFF CANNOT DEMONSTRATE A PRIMA FACIE CLAIM FOR FAILURE TO ACCOMMODATE UNDER TITLE VII ..................................... 8

A. Plaintiff Cannot Demonstrate a Prima Facie Case of Failure to Accomodate ..8

B. UCS Acted in Good Faith and Made Reasonable Efforts Concerning Plaintiff's and Other Employees' Applications in Light of the Circumstances During the Pandemic ........................................................................................ 11

(i) There are no specific requirements to satisfy the interactive process…….11

(ii) Courts have deemed UCS' process reasonable under the law, therefore Plaintiffs claims are barred by collateral estoppel…………………………14

III. CONSIDERING AND RESPONDING TO LATE INQUIRIES, SUBMISSIONS, AND REQUESTS WOULD HAVE BEEN AN UNDUE HARDSHIP ON UCS..18

CONCLUSION ........................................................................................ 24

TABLE OF AUTHORITIES


**Cases** **Page**

*Algarin v. NYC Health + Hospitals Corp.*, 2023 WL 4157164 (S.D.N.Y. June 23, 2023) ........................ 25

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 9

*Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60 (1986) ............................................................. 15

*Baker v. Home Depot* 445 F. Supp. 3d 541 (2d Cir 2006) ........................................................ 10, 11, 12

*Berger v. N. Y. City Police Dept.*, 304 F. Supp. 3d 360 (S.D.N.Y. 2018) ................................................ 17

*Brignall v. Unified Court System*, Index No. E2022-0241CV (Sup. Ct. Steuben Co. 2022).................... 20

*Chauhan v. MM Hotel Management, LLC*, 2019 WL 6118006 (E.D.N.Y. Nov. 18, 2009) ..................... 12

*Civ. Serv. Emps. Ass'n, Inc. v. N.Y. State Pub. Emp. Rels. Bd.*, 157 N.Y.3d 675 (Sup. Ct. NY Co. 2021), *aff'd In re Civ. Serv. Emps Ass'n, Inc., Loc 1000, AFSCME, AFL-CIO v. N.Y. State (Unified Ct. Sys.)*, No. 534183 (3d Dep't Oct. 28, 2021). .................................................................................................. 18

*Corrales v. Montefiore Med. Ctr.*, 2023 WL 2711415 (S.D.N.Y. March 30, 2023) ................................ 22

*Cosme v. New York City Dept of Edu*2000 WL 1682755 (S.D.N.Y. Nov. 9, 2000) .......................... 12, 21

*EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015) ..................................................... 10, 11

*Elmenayer v. ABF Freight Sys.* 2001 WL 1152815 (E.D.N.Y. Sept. 20, 2001) ..................................... 12

*Feringa v. Andrews*, 2021 WL 2036676 (N.D.N.Y. May 20, 2021) ....................................................... 15

*Ferrelli v. State of New York Unified Court Sys.* 2022 WL 673863 (N.D.N.Y. Mar. 7, 2022) .......... 18, 19

*Ferrelli v. State of New York*, No. 031506/2022 (Sup. Ct. Rockland Co., Aug. 2, 2022) ........................ 19

*Groff v. DeJoy*, 600 U.S. ___, 143 S.Ct. 2279 (2023) ..................................................................... 21

*Hicks v. Baines*, 593 F.3d 159(2d Cir. 2010)....................................................................................... 9

*Hohider v. United Parcel Serv., Inc.* 574 F.3d 169 (3d Cir. 2009)............................................................ 6

*In the Matter of Donna Cichon*, Unemployment Insurance Appeal Board, No. 626048, [date] .............. 21

*In the Matter of Marie Zweig*, Unemployment Insurance Appeal Board, No. _____ .............................. 21

*Kulak v. City of N.Y.*, 88 F.3d 63 (2d Cir. 1996)........................................................................... 17

*Lowman v. NVI LLC*, 821 Fed. Appx. 29 (2d Cir. 2020)...................................................................... 11

*Marte v. Montefiore Med. Ctr.*, 2022 WL 7059182 (S.D.N.Y. Oct. 12, 2022) ........ 22

*McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92 (2d Cir. 2009) ........ 15

*Noll v. International Business Machines Corp.*, 787 F.3d 89 (2d Cir. 2015) ........ 17

*Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943(2d Cir. 2008) ........ 14

*Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528(S.D.N.Y. 2014) ........ 15

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133(2000) ........ 9

*Riley v. N.Y.C. Health & Hosps. Corp.*, 2023 WL 2118073 (S.D.N.Y. Feb. 17, 2023) ........ 22

*Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154(10th Cir. 1999) ........ 17

*Suffolk County Court Employees Assoc., Inc. v. NYS Unified Court System*, Case Nos. U-38081, U-38084, U-38087, U-38090, U-38081, U-38091, U-38093, U-38096, U-38099, U-38104, U-38107, U-38129 (NY Public Employment Relations Board, Feb. 24, 2023) ........ 18

*Thomas v. Nat'l Assoc. of Letter Carriers* 225 F.3d 1149 (10th Cir. 2000) ........ 12

*Thompson v. City of New York*, 2002 WL 31760219 (S.D.N.Y. Dec. 9, 2002) ........ 14

*Ventrasca-Cohen v. DiFiore*, 77 Misc.3d 652 (Sup. Ct. Albany Co. 2022) ........ 20

*We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021) ........ 22

*Weinstock v. Columbia Univ.*, 224 F.3d 33 (2d Cir. 2000) ........ 9

**Federal Statutes**

Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* ........ passim

42 U.S.C. § 2000e-2(a)(1) ........ 10

42 U.S.C. § 2000e-2(a)(2) ........ 10

42 U.S.C. § 2000e(j) ........ 21

29 C.F.R. 1630.2(p)(2) ........ 12

29 C.F.R. 1630.2(o)(3) ........ 13

**Federal Rules of Civil Procedure**

Fed. R. Civ. P. 56 ........ 5

Fed. R. Civ. P. 56.1 ........ 5

**State Statutes**

10 N.Y.C.R.R. 2.61(d)(1) .......... 22

N.Y. Civ. Serv. §209-a(1)(d) .......... 18

## Preliminary Statement

Plaintiff Jessica Bergin, brings this action by her Complaint, dated September 2, 2022, against the New York State Unified Court System (hereinafter "UCS"). Plaintiff alleges a single claim pursuant to Title VII of the Civils Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII") contending that UCS discriminated against her based on her religion. Specifically, plaintiff, who at all relevant times was an employee of UCS serving in the title of Court Officer and subject to UCS policies and procedures, alleges that UCS failed to accommodate her request for a religious exemption from its COVID-19 vaccination policy without demonstrating an undue hardship. Plaintiff seeks compensatory damages, injunctive relief, and attorneys' fees and costs.

This memorandum of law is respectfully submitted by defendant UCS in support of its motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure. Pursuant to the Court's Minute Entry and Order, dated June 23, 2023, the parties are not submitting statements pursuant to Rule 56.1. Because there are no material facts in dispute and plaintiff cannot demonstrate that she was discriminated against, UCS' motion for summary judgment should be granted.[1]

## Statement of the Case

**Background**

### A. Plaintiff's Employment with UCS

Plaintiff was employed with UCS from July 2016 through April 2022 as a full-time court officer assigned to the Richmond County Criminal Court. *See* Compl. ¶¶ 10, 12.[2] In or about

[1] Also submitted herewith is the Declaration of Michael Siudzinski, dated July 28, 2023 ("Siudzinski Decl.") and the annexed exhibits, the Affidavit of Justin Barry, dated July 28, 2023, and the Declaration of Mindy Jeng, dated July 28, 2023. Pursuant to the Court's Individual Rules and Practices, Rule III.B.4, exhibits previously submitted to the Court are identified by their ECF # and page and are not submitted herewith.

[2] All further citations to the complaint are abbreviated herein to "¶," for the relevant paragraph(s).

January 10, 2022 Plaintiff was deemed "unfit for service" on the basis that she was not vaccinated against COVID-19. ¶ 11; *See* ECF #13-5 (UCS Ex. E).[3] On April 7, 2022, UCS terminated Plaintiff's employment. ¶ 10.

**B. Plaintiff's Request for a Religious Exemption to the Vaccine Policy**

On September 10, 2021, UCS notified its employees by official memorandum that UCS would "require all judges and non-judicial personnel to be vaccinated by September 27, 2021, unless otherwise approved for an exemption due to medical reasons or sincerely held religious beliefs." ¶ 14; ECF #13-1 (UCS Ex. A). The memorandum stated that "exemptions to the mandatory vaccination requirement will be considered for…employees with sincerely held religious beliefs and practices that prohibit them from receiving a COVID-19 vaccine." ¶ 15; ECF #13-1 (UCS Ex. A). The memorandum further stated that "applications for religious exemption must contain the employee's written, signed, and notarized statement detailing the religious basis for his/her objection to COVID-19 vaccination and the religious principle(s) that guide the objections to COVID-19 vaccination." ¶ 15; ECF #13-1 (UCS Ex. A). The deadline for judges and non-judicial personnel to apply for the religious or medical vaccine exemption was set for September 27, 2021. ¶ 16; ECF #13-1 (UCS Ex. A). Employees were directed to upload their exemption requests on or before September 27, 2021, through the online employee portal. ¶ 16; ECF #13-1 (UCS Ex. A).

The memorandum also stated that "employees who timely file a request for exemption will be subject to the Mandatory Testing Program while their request is being reviewed. *See* ECF #13-1 (UCS Ex. A). Those employees who are granted a medical or religious exemption to vaccination will be subject to the Mandatory Testing Program during the specified exemption

[3] All further citations to the exhibits annexed to the Warshawsky Declaration ("1", "2", "3", etc.) or the Siudzinski Declaration ("A", "B", "C", etc.) are abbreviated herein to "Ex."

period." ¶ 17; ECF #13-1 (UCS Ex. A). The Mandatory Testing Program was implemented on September 7, 2021 and applied only to non-vaccinated personnel. ¶ 18; ECF #13-1 (UCS Ex. A). It was conducted on a weekly basis. ¶ 18; ECF #13-1 (UCS Ex. A). Plaintiff was a participant in the Mandatory Testing Program because she was unvaccinated. ¶ 19.

On September 26, 2021, plaintiff submitted a request for a religious exemption to the UCS COVID-19 vaccination policy using the forms annexed to the September 10, 2021, UCS Vaccination Policy Memorandum. ¶ 21; ECF #13-1, 13-2 (UCS Ex. A, B). Included with her vaccination exemption request, plaintiff annexed a letter from her pastor at the International Christian Center, which stated, in relevant part, that the "International Christian Center supports its religious belief [that] receiving a vaccine that uses aborted fetal cell lines in the development or testing of the vaccine violates their sincerely held religious beliefs regarding the sanctity and protection of pre-born children." ¶ 23; ECF #13-2 (UCS Ex. B). Plaintiff did not include similar language in her request, presumably relying on her pastor's statements.

On November 8, 2021, the UCS Vaccination Exemption Committee sent plaintiff a letter and questionnaire requesting "more information before it can make a final determination." ¶ 24; ECF #13-3 (UCS Ex. C). UCS requested further information from plaintiff regarding her history of taking or abstaining from medications and vaccines that were developed and tested with fetal cell lines, and specifically requested that plaintiff complete both Sections A and B thereof. ¶ 24; ECF #13-3 (UCS Ex. C).

On November 26, 2021, plaintiff submitted her response to UCS' request for more information. ¶ 25; ECF #13-4 (UCS Ex. D). Within her submission, plaintiff declined to answer the questions regarding her prior use of other medications and vaccinations on the grounds that, "my family and I strive to keep our individual medical information private." ¶ 25; ECF #13-4

(UCS Ex. D). The questions regarding prior medication and vaccination history were requested by each employee who sought a religious vaccine exemption. ¶ 27.

On December 29, 2021, plaintiff was informed by letter from UCS that her religious vaccination exemption request was denied. ¶ 28; ECF #13-5 (UCS Ex. E). As a result, plaintiff was required to submit proof of taking her first dose of a COVID-19 vaccination on or before January 10, 2022. ¶ 28; ECF #13-5 (UCS Ex. E). On January 3, 2022, plaintiff attempted to submit a revised set of answers to the questionnaire. ¶ 32. On January 4, 2022, plaintiff's supervisor received an email from UCS Administrative Counsel, Mindy Jeng, informing plaintiff that "the Committee's decisions are final, and the new request would not be considered." ¶ 33. The email from Ms. Jeng stated that plaintiff was required to "submit proof of vaccination by January 10, 2022." ¶ 33. To date, plaintiff has not taken a COVID-19 vaccination. ¶ 35.

**C. Plaintiff's separation from service with UCS and reinstatement**

On January 10, 2022, plaintiff was sent a memorandum stating that plaintiff was "unfit for service for your failure to comply with the Vaccination Mandate." ¶ 36; ECF #13-5 (UCS Ex. E). Plaintiff was instructed that she could not "report to work until you have submitted the required proof of vaccination and the submission has been confirmed by your supervisor." ¶ 36; ECF #13-5 (UCS Ex. E). On January 10, 2022 UCS placed plaintiff on administrative leave using her accrued paid leave days until she was terminated on April 7, 2022 for failing to "comply with the Vaccination Mandate." ¶ 49.

On February 15, 2023, UCS rescinded its vaccination policy and as of that date, no longer required judges and non-judicial employees to be vaccinated against COVID-19. *See* Barry Aff., ¶ 79. Concurrently, UCS also announced that it would allow any employee who was terminated as a result of non-compliance to seek reinstatement beginning on February 17, 2023. *Id.* at ¶ 80.

On April 20, 2023, UCS distributed a letter to all previously terminated employees stating that the employee was eligible to seek reinstatement. *Id.* Plaintiff submitted a reinstatement request which was received by UCS on May 25, 2023. *Id.* at ¶ 81. On June 22, 2023 UCS reinstated plaintiff to her position of Court Officer at the Richmond County Criminal Courthouse. *Id.*

**Summary Judgment Standard of Review**

Summary judgment must be granted if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). To avoid summary judgment, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). Mere "conclusory statements, conjecture, or speculation by the party resisting the motion will not defeat summary judgment," *Kulak v. City of N.Y.*, 88 F.3d 63, 71 (2d Cir. 1996), nor can such statements "create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted). The non-moving party must provide "sufficient evidence," not just "some evidence," to withstand summary judgment. *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotations omitted), *cert. denied*, 540 U.S. 811 (2003). These standards apply no less to discrimination cases than to other areas of litigation. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000) (noting that trial courts should not "treat discrimination [cases] differently from other ultimate questions of fact") (internal citations and quotations omitted). A genuine issue of fact exists if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## ARGUMENT

### I. PLAINTIFF CANNOT DEMONSTRATE THAT UCS OR ITS EMPLOYEES HAD A MOTIVE TO AVOID PROVIDING AN ACCOMMODATION TO HER RELIGIOUS PRACTICES

Plaintiff alleges a single cause of action under Title VII under a theory of failure to accommodate her religious beliefs. Plaintiff, by her letter in support of her proposed motion for summary judgment, argues that UCS is liable for a claim of failure to accommodate on the basis that caselaw requires nothing more than demonstrating: 1) she held a bona fide religious belief conflicting with an employment requirement; 2) she informed her employers of this belief; and 3) she was disciplined for failure to comply with the conflicting employment requirement. *See* Bergin Letter, June 14, 2023, found at ECF #25 (citing *Baker v. Home Depot*, 445 F.3d 541, 546 (2d Cir. 2006)). Plaintiff argues that if she establishes the three factors above, then UCS' only possible defense is to demonstrate an undue hardship. In the matter of *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768 (2015), the Supreme Court ruled that there must be a showing of motive. In other words, an employer is not necessarily liable for failing to provide a reasonable accommodation, even if the employer cannot demonstrate undue hardship.

In *EEOC*, the Supreme Court found that there are just two types of discrimination claims under Title VII, (i) disparate treatment (or "intentional discrimination") (§ 2000e-2(a)(1)) and (ii) disparate impact (§ 2000e-2(a)(2)). *See id.* at 771 (finding these two provisions "are the only causes of action under Title VII."). The Supreme Court further explained that Title VII claims alleging a failure to accommodate should be analyzed as disparate treatment claims. *Id.* at 772. Additionally, the Supreme Court found that the "because of" phrase in the disparate treatment/intentional discrimination provision of Title VII (§ 2000e-2(a)(1)) does not require the employer to have actual knowledge of the employee's need for an accommodation to be found

liable (in contrast to the ADA). *Id.* at 771. "Instead, the intentional discrimination provision prohibits certain *motives*, regardless of the state of the actor's knowledge. . . . An employer who has actual knowledge of the need for an accommodation does not violate Title VII by refusing to hire an applicant *if avoiding the accommodation is* ***not*** *his motive*." *Id.* at 773 (emphasis in original); *see also Lowman v. NVI LLC*, 821 Fed. Appx. 29, 31 (2d Cir. 2020). Although the Supreme Court did not find that an employer's motive must be discriminatory in nature, the ruling makes it clear that there must be some showing of the employer's mental state, specifically that the employer was motivated to avoid providing an accommodation. In contrast to plaintiff's argument, the Supreme Court's ruling in *EEOC* demands more than the three factors listed in *Baker*.

Accordingly, plaintiff must demonstrate that UCS was actively trying to avoid providing her with a reasonable accommodation. There is no evidence of any such motive or intention in this case (whether discriminatory in nature or not). In contrast, the evidence clearly establishes that UCS actively *sought to provide* reasonable accommodations to employees who needed one: it created a process for employees to request an accommodation from its vaccination policy, it informed all of its employees of how to apply for an accommodation, it created simple forms for employees to use and an online portal to easily submit them, and it only denied such requests when the employee failed to provide the necessary information or gave inconsistent information. (Barry. Aff., ¶¶ 35, 49; Jeng Decl. ¶¶ 8-19). UCS's motion for summary judgment should be granted because there is no evidence in the record to demonstrate that it or its employees were motivated to avoid providing reasonable accommodations, much less plaintiff's request for a reasonable accommodation. Indeed, as Justin Barry stated in his deposition, had plaintiff submitted the completed form (*i.e.* her second submission from January 4, 2022) before the

November 22, 2022 deadline instead of the incomplete form he would have voted to grant her request. *See* Siudzinski Decl., Ex. K, page "80". The Court should grant UCS's motion for summary judgment because there is no evidence of such a motive on the part of UCS or its employees.

## II. PLAINTIFF CANNOT DEMONSTRATE A PRIMA FACIE CLAIM FOR FAILURE TO ACCOMMODATE UNDER TITLE VII

### A. Plaintiff cannot demonstrate a prima facie case of failure to accommodate

To establish a prima facie failure to accommodate claim under Title VII, a plaintiff must demonstrate three elements: 1) she held a bona fide religious belief conflicting with an employment requirement; 2) she informed her employers of this belief; and 3) she was disciplined for failure to comply with the conflicting employment requirement. *See Chauhan v. MM Hotel Management, LLC* 2019 WL 6118006 (E.D.N.Y. Nov. 11, 2019) (*citing Baker v. Home Depot*, 445 F.3d 541, 543 (2d Cir. 2006)).

Plaintiff cannot establish a prima facie claim of Title VII religious discrimination based on her first exemption request because she failed to inform UCS of her religious beliefs through the interactive process. Plaintiff's second request, submitted after UCS denied the first one and well after the deadlines for such submissions, could support a prima facie claim but it was an undue hardship for UCS to consider plaintiff's late submissions and other employees' late submissions, inquiries, and appeals after the original deadline. *See*, *infra*, Point III. In any event, UCS acted in good faith and reasonably under the exigent circumstances to accomplish its core mission of providing public court services.

The process of finding a reasonable accommodation is intended to be an interactive process in which both the employer and employee participate. *See Elmenayer v. ABF Freight Sys.*, 2001 WL 1152815, at *5 (E.D.N.Y. Sept. 20, 2001) (*citing Thomas v. Nat'l Assoc. of Letter*

*Carriers*, 225 F.3d 1149 (10th Cir. 2000)). Once an employer shows it has made a good faith effort to accommodate, the employer need not further show that each of the employee's alternative accommodations would result in undue hardship. *Id.*; *see also Cosme v. Henderson*, 2000 WL 1682755, at *6 (S.D.N.Y. Nov. 9, 2000). UCS was neither required to nor able to provide plaintiff with a reasonable accommodation when she refused to provide the requested information. *See Elmenayer*, 2001 WL 1152815, at *5; *Cosme*, 2000 WL 1682755, at *6.[4]

Plaintiff's own allegations demonstrate that she failed to inform UCS of her religious beliefs in the first instance and not until after she was denied. Plaintiff acknowledges and concedes that UCS set up a policy for a process to apply for an exemption. ¶16. She concedes that this policy mandated an initial deadline of September 27, 2021. ¶16. Plaintiff further concedes that she was asked to provide additional information in furtherance of her religious exemption through a supplemental form and questionnaire. ¶24-25. Plaintiff's initial request included references to a moral and ethical objection to the ingredients used in the development of the COVID-19 vaccinations. ECF #13-2 (UCS Ex. B). While Plaintiff did not specifically state she objected to abortion in her written submission, she referred to a letter written by her pastor attached to the request. ¶23; ECF #13-2 (UCS Ex. B). In a letter authored by Ronald Squibb, Senior Pastor at the International Christian Center, he referred to abortion, stem-cell research, the use of fetal stem-cells in the development and testing of the COVID-19 vaccines, and the church's objection to such use. ¶23; ECF #13-2 (UCS Ex. B). Due to this reference, UCS

[4] Pursuant to federal regulations, the purpose of the informal interactive process is "to determine the appropriate reasonable accommodation . . . ." *See* 29 C.F.R. § 1630.2(o)(3). Accordingly, it is not altogether clear, and certainly not required by statute or case law, that the interactive process is meant to apply to the threshold question of whether the employee, (i) held a bona fide religious belief conflicting with an employment requirement; and (ii) informed her employer of this belief. Indeed, under the ADA and Rehab Act, the notice requirement for the employee is waived if the individual's disability is clear, making the employer obligated to engage in the interactive process. If the Court finds that plaintiff did not inform UCS of her beliefs it arguably need not address the issue of whether either party reasonably engaged in the interactive process.

sought further information from Plaintiff regarding her past use of certain medications and treatments that also used fetal stem-cell lines in development and testing. ECF #13-3 (UCS Ex. C), UCS also included a firm deadline to submit the supplemental form and questionnaire, requiring Plaintiff to submit the documents by end of business on November 22, 2021. ECF #13-3 (UCS Ex. C). Plaintiff submitted her supplemental form and questionnaire on November 16, 2021. ¶25; ECF #13-4 (UCS Ex. D). Plaintiff, however, refused to fill out the questionnaire and instead submitted another personal statement. ¶25. Plaintiff made no further submissions prior to the November 22, 2022 deadline.

In assessing the parties' engagement in an interactive process, "a court should look for signs of good faith or bad faith…" *See Thompson v. City of New York* 2002 WL 31760219 at *8 (S.D.N.Y. Dec. 9, 2002). "A party that fails to communicate or withholds important information solely within the knowledge of that party, can be found to have obstructed the process in bad faith." *Id*. By plaintiff's own admission in her Complaint, she chose to withhold information solely within her own knowledge from UCS prior to the November 22, 2022 deadline. ¶25; ECF #13-3 (UCS Ex. C). UCS denied plaintiff's religious first exemption request on the basis that it was incomplete because she did not respond to the questions therein. ¶28; ECF #13-3 (UCS Ex. E).

Plaintiff cannot establish a prima facie case of religious discrimination concerning her first request because she did not inform UCS of her alleged religious beliefs—either in the application or the supplemental form—instead relying on bald statements that she had sincerely-held beliefs against the COVID-19 vaccine. "An employee who is responsible for the breakdown of that interactive process may not recover for a failure to accommodate." *Nugent v. St. Lukes-Roosevelt Hosp. Ctr.*, 303 F. App'x 943, 945-46 (2d Cir. 2008).

### B. UCS acted in good faith and made reasonable efforts concerning plaintiff's and other employees' applications in light of the circumstances during the pandemic

#### (i) There are no specific requirements needed to satisfy the interactive process

If an employee makes a request for a reasonable accommodation under Title VII on religious grounds, both the employer and employee are supposed to discuss the matter through an interactive process. *See*, *supra*, Point II.A. Most cases discussing the interactive process concern claims made under the ADA and the Rehab Act for requests to accommodate individuals with physical and mental disabilities. *See, e.g., McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 99-102 (2d Cir. 2009). Neither the relevant statutes—the ADA, the Rehab Act, or Title VII—nor the courts—within this Circuit and others—dictate any specific procedure or obligations of employers and employees other than to act in "good faith" and to make "reasonable efforts" under the given set of circumstances. *See Feringa v. Andrews*, 2021 WL 2036676, at *9 (N.D.N.Y. May 20, 2021), quoting *Quadir v. N.Y. State Dep't of Labor*, 39 F. Supp. 3d 528, 540 (S.D.N.Y. 2014). Indeed, the Supreme Court has stated that if the employer shows that it made a good faith effort to accommodate the employee's religious beliefs, then it has satisfied its obligations under Title VII and "the statutory inquiry is at an end." *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 70 (1986).

UCS is the judiciary of New York State, one of three co-equal branches of government, responsible for operating and administering all of the courts within New York other than the handful of federal courts. N.Y. Const., art. VI, § 1. UCS employs 16,000 judges and non-judicial staff in 220 courthouses and facilities across all of New York's 62 counties. *See* Barry Aff., ¶ 4. During the initial phase of the COVID-19 pandemic, UCS temporarily ceased all in-person operations for approximately two months. *Id.* at ¶¶ 12-14. The business of the court system, however, did not and cannot stop because it provides a necessary government function as

required by the United States' and New York's respective Constitutions. *Id.* at ¶ 15. Indeed, although in-person operations temporarily ceased, the court system was flooded with new filings immediately after returning to partial operations in May 2020, creating a significant backlog. *Id.* at ¶ 21. To date, more than three years later, that backlog has not been fully resolved. *Id.*

After returning to partial operations in May 2020, UCS was thwarted by the impact that the pandemic was having on its employees, including their reasonable fears of returning to in-person operations when, at the time, no proven guidelines existed on limiting the spread and their need to stay home for extended absences to care for themselves and family members after contracting or being exposed to COVID-19. *Id.* at ¶ 23.

In light of these circumstances, UCS determined that returning to full operations would be best accomplished by implementing a COVID-19 vaccination policy for staff, with the goal of attaining the highest possible compliance rate. *Id.* at ¶¶ 27-31. The need for a high level of compliance was especially important for UCS which, in contrast to many government agencies and private employers, cannot cease its operations or operate with its staff working from home because such a result would bar the public from accessing its services. *Id.* at ¶¶ 31, 43. Furthermore, this requirement was important for UCS to also protect members of the public, many of whom are at the court involuntarily and may themselves not be able to be vaccinated. *Id.* at ¶ 31.

As discussed in detail in Mr. Barry's affidavit, UCS created a process by which its employees could apply for an exemption from its vaccination policy on religious or medical grounds. *Id.* at ¶ 35. In furtherance thereof, UCS created forms for employees to complete, an online portal to make submissions, and a committee (*i.e.* the VEC) of judges and senior administrators responsible for reviewing and voting on employee requests. *Id.* at ¶¶ 35-36, 40.

Additionally, UCS assigned in-house attorneys and support staff to advise and assist the VEC. *Id.* at ¶¶ 38-39. The VEC members, in-house attorneys, and support staff collectively devoted hundreds of hours to this process in addition to their regular full-time job responsibilities. *Id.* at ¶¶ 46-52. The VEC's exemption review process was anonymous to avoid bias against or favoritism towards employees. *Id.* at ¶¶ 48-49; Jeng Decl., ¶ 15-16. In reviewing religious based requests, the VEC never sought to assess the veracity of an employee's beliefs and granted every employee request that both answered the questions on the forms and articulated a clear religious belief or tenet that prevented them from being vaccinated. *See* Barry Aff., ¶ 49.

Because of the significant amount of time and resources devoted to the exemption review process and in addition to the need to return to full court operations, UCS determined that it was necessary to set strict deadlines for employees to make their submissions, past which new applications would not be accepted except for limited circumstances such as if the employee was previously on leave or was hired thereafter. *Id.* at ¶¶ 63, 71-74. The deadlines were reasonable and clearly identified in the vaccination policy itself as well as the request form and supplemental form. *Id.* at ¶¶ 58-64. The vast majority of employees complied with these deadlines and none of the UCS employee unions, which are responsible for protecting their members' rights, challenged the deadlines. *Id.* at ¶ 63.

An employer's good faith efforts to accommodate an employee's beliefs may be satisfied by demonstrating that it considered the employee's request. *See Berger v. N. Y. City Police Dept.*, 304 F. Supp. 3d 360, 371 (S.D.N.Y. 2018) ("If an employer has made reasonable efforts to communicate with an employee . . . an employer will not be liable for failing to make an accommodation under the ADA."); *see also Noll v. International Business Machines Corp.*, 787 F.3d 89, 98 (2d Cir. 2015) ("To hold employers liable for the failure of an interactive process

regardless of whether a reasonable accommodation was made would not serve the underlying purposes of the ADA, and would, contrary to our precedent, elevate the ADA's interactive process requirement to an end in itself.") (quoting *Hohider v. United Parcel Serv., Inc.* 574 F.3d 169, 193-94 (3d Cir. 2009); *Smith v. Midland Brake, Inc., a Div. of Echlin, Inc.*, 180 F.3d 1154, 1172 (10th Cir. 1999) (holding that "[a]ll the interactive process requires is that employers make a good faith effort to seek accommodations.") It is undisputed that UCS accepted plaintiff's first application, requested additional information from plaintiff on the supplemental form, and plaintiff willingly withheld the necessary information. *See* Compl. ¶¶ 16, 24-25. As stated above, neither Title VII nor prior caselaw mandate, much less suggest, that UCS should have given plaintiff another opportunity to be forthcoming in her submissions. Plaintiff knew of the deadlines and knew that she was withholding the required information. UCS acted in good faith and made more than reasonable efforts to provide plaintiff and all of its employees with reasonable accommodations under the unprecedented and exceptional circumstances of the COVID-19 pandemic.

**(ii) Courts have deemed UCS' process reasonable under the law and therefore plaintiff's claim is barred by collateral estoppel**

In other actions and administrative proceedings commenced prior to this action, UCS employee unions and individual employees challenged the legality and the implementation of UCS's COVID-19 vaccination policy. UCS has prevailed in all such challenges against a range of arguments concerning its vaccination policy, including its exemption request process.[5]

[5] There is one exception, not applicable herein because the determination was based on the requirements found under all UCS employee union contracts. *See Suffolk County Court Employees Assoc., Inc. v. NYS Unified Court System*, Case Nos. U-38081, U-38084, U-38087, U-38090, U-38081, U-38091, U-38093, U-38096, U-38099, U-38104, U-38107, U-38129 (NY Public Employment Relations Board, Feb. 24, 2023) (finding that UCS' implementation of the vaccination policy without engaging in bargaining with the unions violated the "*Taylor* Law" (*see* Public Employees Fair Employment Act § 209-a.1(d)) and requirements under the employee union contracts. The decision is pending appeal before a full panel of the PERB.

In the first relevant proceeding, the New York Supreme Court, Albany County, denied ten UCS unions' motion to preliminary enjoin the policy, decisively rejecting the argument that UCS's decision to implement it without engaging in collective bargaining constituted irreparable harm to noncompliant UCS employees. *See Civ. Serv. Emps. Ass'n, Inc. v. N.Y. State Pub. Emp. Rels. Bd.*, 157 N.Y.3d 675 (Sup. Ct. NY Co. 2021), *aff'd In re Civ. Serv. Emps Ass'n, Inc., Loc 1000, AFSCME, AFL-CIO v. N.Y. State (Unified Ct. Sys.)*, No. 534183 (3d Dep't Oct. 28, 2021).

In the most notable action against UCS, the District Court for the Northern District of New York (hereinafter "Northern District") denied a motion to enjoin the vaccination policy on the grounds that it violated plaintiffs' First Amendment rights, holding that the policy and its religious exemption process, including the requirement that employees complete the supplemental form, was constitutional both on its face and as applied to the plaintiffs therein—UCS employees whose religious exemptions requests had been denied. *See Ferrelli v. State of New York Unified Court System*, 2022 WL 673863, at *6-9 (N.D.N.Y. Mar. 7, 2022) ("*Ferrelli I*"). Indeed, the court found, "[I]f [UCS's] carefully designed exemption process is not narrowly tailored to grant exemptions only to those with sincerely held religious objections, ***it is difficult for the Court to conceive of an exemption process that would be***." *Id.* at *8 (emphasis added). The court did not qualify its ruling on a requirement that UCS alter its exemption process in any way, much less by considering late submissions and appeals. The Court reviewed UCS's process and determined—under the exigent circumstances of the pandemic at the time and the needs of UCS to fulfill its core mission and to protect the health of its employees and the public—that UCS acted rationally and reasonably and complied with the First Amendment. *Id.* Accordingly, any finding by this Court that UCS should have allowed late submissions, appeals of denials, or

other alterations to its process would be in contradiction to the Northern District's ruling and is arguably barred by collateral estoppel.

Subsequent court and administrative orders have reached similar results. For example, in the matter of *Ferrelli v. State of New York*, No. 031506/2022 (Sup. Ct. Rockland Co., Aug. 2, 2022), petitioner Ferrelli, with other plaintiff employees not party to *Ferrelli I*, brought a proceeding under Article 78 of New York Civil Practice Law and Rules seeking an order declaring that UCS's implementation of its vaccination policy, including UCS's denial of the petitioners' respective religious exemption requests and eventual termination of their employment, was arbitrary and capricious and an abuse of discretion. Siudzinski Decl., Ex. F. Petitioners, in support of their claims, argued that UCS and its administrators violated their First Amendment rights, as well as New York's Constitution (art. 1, § 6) and common law. The Supreme Court denied the petition on the grounds that the policy *and its application to the petitioners* were both facially neutral, generally applicable, and satisfied rational basis review. *Id.*, at *16. As stated by the court, UCS is not required to "grant every request for a religious exemption, even where the request is incomplete or contains inconsistent or contradictory responses that undermine the stated reason for the request." *Id.*

The following matters are similar: *Brignall v. Unified Court System*, Index No. E2022-0241CV, at *2 (Sup. Ct. Steuben Co. 2022) (holding that the petitioner-employees were unlikely to succeed on the merits of their claims because (i) UCS's policy was not arbitrary or capricious and that it was in fact supported by a rational basis because, among other things, the UCS had relied on guidance from public health authorities; (ii) the policy's religious exemption process was neutral and generally applicable, and passed rational basis review; and (iii) UCS had the authority to issue the Policy.) Siudzinski Decl., Ex. G.; *Ventrasca-Cohen v. DiFiore*, 77 Misc.3d

652 (Sup. Ct. Albany Co. 2022) (holding that UCS's denial of religious exemption requests not based on a religious belief and requests in which the employee did not complete the forms was rational, but denials of requests in which the employee made inconsistent statements concerning the COVID-19 vaccines in comparison to other drugs that may be needed during a medical emergency was irrational); *In the Matter of Donna Cichon*, Unemployment Insurance Appeal Board, No. 626048, dated January 13, 2023 (following its earlier ruling in Appeal Board No. 622828 and holding that UCS's vaccine policy "furthered the compelling governmental interest of combatting the virus and protecting the health and safety of its employees and the public" and "was justified and reasonable.") Siudzinski Decl., Ex. H.; *In the Matter of Marie Zweig*, Unemployment Insurance Appeal Board, No. 624691, dated October 12, 2022 (similar) Siudzinski Decl., Ex. I.

With limited exceptions not relevant here, every court and forum that has had the opportunity to review UCS's vaccination policy and its implementation has found that UCS acted rationally and reasonably and did not violate any of the respective employees' rights. Although these matters did not address late exemption requests, the procedures for submitting such requests—which impliedly includes the deadlines for submissions, the anonymous process precluding discussions between applicant-employees and VEC voting members, and the exclusion of an appeal process—was upheld in every instance. Accordingly, the issue of whether UCS acted reasonably by setting deadlines and precluding appeals and further discussions has been settled by the courts and therefore plaintiff's claim is arguably barred by the doctrine of collateral estoppel.

Lastly, had UCS not followed its own procedures and considered late submissions such as plaintiff's, UCS would have been subject to lawsuits alleging that it had acted in an arbitrary

and capricious manner by making exceptions for employees who failed to comply with the policy's deadlines. Any argument that UCS should have created an appeal process or should have extended the deadline for employees whose requests were denied in the first instance, ignores the exigent circumstances under which UCS was operating and its needs to make timely decisions to bring the court system back to full operations. Accordingly, the Court should grant UCS's motion for summary judgment because there are no material facts at issue and no reasonable juror could conclude that UCS acted in bad faith or unreasonably under the circumstances.

## III. CONSIDERING AND RESPONDING TO LATE INQUIRIES, SUBMISSIONS, AND REQUESTS WOULD HAVE BEEN AN UNDUE HARDSHIP ON UCS

Even if the Court finds that plaintiff has established a prima facie claim for failure to accommodate, the Court should grant UCS' motion because considering and responding to employees' inquiries, submissions, and requests made after the deadline would have been an undue hardship on its operations. *See* § 2000e(j); *Cosme v. Henderson*, 287 F.3d 152, 158 (2d Cir. 2002). The Supreme Court recently clarified its prior rulings that an undue hardship arises from substantial burdens on the employer, more than *de minimis*. *See Groff v. DeJoy*, 600 U.S. ___, 143 S.Ct. 2279 (2023). The Supreme Court further clarified that its ruling was not intended to abrogate all past decisions or the guidance of the EEOC on what constitutes an undue hardship. *See id.* at 2295-97.

The Code of Federal Regulations outline the following factors to be considered in defining what is an undue hardship on an employer:

> (i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

(ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

(iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

(iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

(v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

29 C.F.R. § 1630.2(p)(2)

Under these guidelines, UCS arguably was not required to provide *any* employees with reasonable accommodations to its vaccination policy because the judicial branch of New York State is obligated under the United States' and New York's Constitutions to operate a public service providing a forum for the public to resolve legal disputes. In a line of cases concerning vaccination requirements for nurses within New York, the District Court for the Southern District of New York (hereinafter "Southern District") found that it would have been an undue hardship on the defendant employers to provide *religious* exemptions to its COVID-19 vaccination policies in light of New York's regulation mandating vaccines for certain health professionals (10 N.Y.C.R.R. § 2.61(d)(1)). *See We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021); *Corrales v. Montefiore Med. Ctr.*, 2023 WL 2711415 (S.D.N.Y. March 30, 2023); *Riley v. N.Y.C. Health & Hosps. Corp.*, 2023 WL 2118073 (S.D.N.Y. Feb. 17, 2023); *Marte v. Montefiore Med. Ctr.*, 2022 WL 7059182 (S.D.N.Y. Oct. 12, 2022); *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266 (2d Cir. 2021). Although UCS employees were not obligated by section 2.61(d)(1) or any other law to receive the COVID-19 vaccination, UCS's core mission (and Constitutional obligation) is to provide court services to the public. UCS administrators

determined that its core mission could only be met if its judges and staff were vaccinated with limited exemptions. *See* Barry Aff., ¶¶ 27-31.

In order to fulfill its core mission of providing court services, UCS needed its judges and non-judicial staff to work in-person to the fullest extent possible under the exigent circumstances of the pandemic. Accordingly, UCS determined that the best way to accomplish this goal was to have a mandatory vaccination policy, with firm deadlines, to obtain as close to one-hundred percent employee compliance as possible. *See* Barry Aff., ¶¶ 27-31, 58-64. In doing so, UCS chose to provide reasonable accommodations to its policy through the creation of the VEC and the exemption process. This process, in and of itself, was an undue hardship.

Each step, starting with the development of its vaccination policy to comply with state and federal law, was an undue hardship. In preparation for the federal approval of the COVID-19 vaccinations for non-emergency use (which occurred in August 2021), UCS administrators consulted with judges, in-house attorneys, and administrative staff throughout the State and hired outside legal representation (Paul, Weiss, Rifkind, Wharton & Garrison, LLP) to consult on the creation of its vaccination policy. *Id.* at ¶ 34. Accordingly, the creation of its vaccination policy alone was a substantial burden, albeit a necessary one in light of the circumstances, on staff time and a significant financial cost.

After UCS implemented the policy on September 10, 2021, UCS then created the VEC and its process for reviewing employee exemption requests. *Id.* at ¶ 34. The creation of the exemption process was an undue burden. It required the development of a simple and easy-to-understand application, one for medical based requests and one for religious based requests, including the creation of the supplemental forms. *Id.* at ¶¶ 40-43. Additionally, UCS diverted staff resources to assist the VEC and to develop and monitor an online portal for employees to

submit their applications. *Id.* at ¶ 38; Jeng Decl,, ¶¶ 7, 15. Furthermore, UCS expended significant amounts of money and staff time in defending the policy in the courts and before the PERB, each of which have resulted in favorable outcomes. *See*, *supra*, Point I.B(ii).

Next, the work of the VEC in reviewing and determining employee exemption requests was, by itself, an undue burden on UCS operations. UCS (the judiciary branch of the New York State government) is a massive state-wide operation with a $3.4 billion annual budget in 2023, comprised of 220 courthouses and facilities in all 62 counties, employing over 16,000 judges and non-judicial staff. *See* Barry Aff., ¶ 4. As described in Barry's Affidavit, the VEC was made up of eleven senior UCS administrators and judges, each of whom had other full-time responsibilities ensuring that UCS was operating during the pandemic. *Id.* at ¶¶ 35-37. In addition to the eleven voting members, two in-house attorneys and at least three other administrative staff supported the VEC's work. *Id.* at ¶¶ 38-39; Jeng Decl. ¶ 15. The in-house attorneys spent time advising the voting members; organized, redacted (with the help of the administrative staff), and distributed employee requests to the voting members; attended all VEC meetings, which occurred at least once a week; tracked the status of each application; and corresponded with employees when more information was needed and after a determination was made. *See* Jeng Decl. ¶¶ 13-19. In the end, UCS received over 1,200 employee exemption requests (7.5% of its total staff) that required undergoing a multi-level review process. *Id.* The VEC members and supporting staff collectively devoted hundreds of hours to UCS's vaccine exemption request process. *See* Barry Aff., ¶¶ 66, 72-73.

The undue burden on UCS did not end after the VEC finished reviewing employees' requests. For employees granted an exemption, they were required to submit proof of weekly COVID-19 testing, which required monitoring to ensure compliance. *Id.* at ¶¶ 47, 76. To

accommodate these employees, UCS provided an hour of excused leave each week to be tested, resulting in approximately 39,500 hours of paid leave. *Id.* at ¶ 76. During this time, UCS diverted staff from other responsibilities to cover for the excused employees, some of whom were paid overtime. *Id.* Additionally, although UCS achieved approximately a 93% employee vaccination rate, unvaccinated employees risked exposing court users—many of whom were not vaccinated themselves. *Id.* at ¶ 77. Because of its core mission and Constitutional obligations to provide a public service, UCS could not mandate that court users, including jurors, be vaccinated before entering its courthouses. Indeed, during the relevant time period, UCS experienced difficulty in conducting jury trials throughout the State because many jurors refused to be seated due to the risk of contracting COVID-19. *Id.* at ¶ 26. At a time when UCS was under scrutiny for not yet returning to full court operations (*see, e.g.* https://www.nydailynews.com/news/ny-two-years-since-global-coronavirus-pandemic-shut-down-nyc-courts-20220313-327hwn77fbelhprgtpcs6xon54-story.html, last visited July 28, 2023), granting accommodations only for legitimate requests under strict deadlines was reasonable to achieve its goal of attaining a high vaccination rate.

In a recent case with facts similar to those herein, the Southern District found that, "tracking compliance with testing, permitting Plaintiff to potentially expose other workers at H+H to the COVID-19 virus, and facing legal consequences if someone should be infected with COVID-19 due to exposure from Plaintiff, *are all significant hardships that create an undue burden*" on the defendant. *Algarin v. NYC Health + Hospitals Corp.*, 2023 WL 4157164, at *8 (S.D.N.Y. June 23, 2023) (emphasis added). UCS faced the same undue hardships.

Given the exigent circumstances described herein, UCS faced an undue hardship during every step of implementing its vaccination policy, considering employees' exemption requests,

and afterwards while monitoring employees for compliance with testing. A requirement that UCS should have extended its deadlines or considered late requests and submissions would have been a further undue hardship on its financial and personnel resources. Lastly, had UCS agreed to consider plaintiff's late request in January 2022, it would have risked subjecting itself to legal challenges from its employee unions—under its union agreements, the Taylor Law, and applicable civil service statutes—and by individual employees for not following its own procedures in an arbitrary and capricious manner and by treating similarly-situated employees differently in violation of Title VII. Accordingly, the Court should find that consideration of plaintiff's second request submitted late on January 3, 2022 would have created an undue hardship on UCS and should grant its motion for summary judgment for all of the reasons herein.

## CONCLUSION

For the foregoing reasons defendant UCS respectfully requests that the Court grant its motion for summary judgment, and deny plaintiff's proposed motion for summary judgment, pursuant to Rule 56 of the Federal Rules of Civil Procedure and for such other and further relief as the Court deems just and proper.

Dated: New York, New York
July 28, 2023

Respectfully submitted,

DAVID NOCENTI
Counsel
Office of Court Administration
Attorney for UCS

By:
/s/
MICHAEL J. SIUDZINSKI
Assistant Deputy Counsel
25 Beaver Street, 10th Fl.
New York, New York 10004
(212) 428-2150

MICHAEL J. SIUDZINSKI
Assistant Deputy Counsel
of Counsel

ROBYN ROTHMAN
Associate Counsel
of Counsel