UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

___________________________________

JESSICA BERGIN,
Plaintiff,
v.
NEW YORK STATE UNIFIED COURT SYSTEM,
Defendants.

Index No. 22-CV-5264

___________________________________

VIDEOCONFERENCE DEPOSITION OF
JESSICA BERGIN

DATE: Wednesday, May 24, 2023
TIME: 9:57 a.m.
LOCATION: New York Unified Court System
25 Beaver Street, Room 1170
New York, NY 10004
REPORTED BY: Mario Melara, Notary Public
JOB NO.: 5935510

J. BERGIN

policy had a different type exemption aside from seeking a religious exemption?

A Yes.

Q Okay. What was your understanding of what the other exemption was?

A Medical.

Q Okay. Are you aware or do you know that for those seeking both a religious and a medical exemption were not issued orange cards?

A Yes, I was aware.

Q Okay. Did you ever have any discussions with anyone on the vaccine committees regarding policies? And I want to limit that to prior to your denial.

A Would you be able to refresh my recollection as to who was on the exemption committee?

Q Sure.

A I just don't want to answer incorrectly.

MR. SIUDZINSKI: Well, let's rephrase this. Did you have a conversation with

J. BERGIN

anyone other than UCS personnel at your courthouse within UCS or OCA about your vaccination exemption request?

THE WITNESS: I thought it was limited. It was like you could just go -- go in and have a dialogue, but I -- to my recollection, no.

MR. SIUDZINSKI: Would you have had a conversation with anyone here at 25 Beaver Street in OCA?

THE WITNESS: I'm not sure who works here, honestly, and this is pre-denial; correct?

BY MS. ROTHMAN:

Q Yes, this is pre-denial. Were you aware of any colleagues of yours that had applied for any religious exemptions to the vaccine?

A Yes.

Q Okay. Approximately how many of your colleagues that you are aware of that applied for religious exemption to the vaccine?

MR. WARSHAWSKY: By colleagues, do

J. BERGIN

you mean in her courthouse?

MS. ROTHMAN: In her courthouse, yes.

THE WITNESS: You said approximately how many?

BY MS. ROTHMAN:

Q Yeah.

A Had applied, specifically applied?

Q Yes.

A Maybe between five and ten. Maybe.

Q Okay. Do you recall any of their names?

A Yes.

Q And what are their names?

A I don't really know. They just told me if they did, or they didn't; not really sure. It's like I don't know who exactly did, but people that voice to me that they were applying for one: Sam [ph], Melissa [ph], Carol [ph].

MR. SIUDZINSKI: Can you provide last names, please?

MR. WARSHAWSKY: What's that?

J. BERGIN

MR. SIUDZINSKI: Last names, please, and/or job titles.

THE WITNESS: And/or?

MR. SIUDZINSKI: If you don't know their last name, maybe you know where they work or what they do.

THE WITNESS: These are court officers that I worked with. Olivia [ph]. I've been told other people were going to. I don't know for certain if they did.

BY MS. ROTHMAN:

Q Yeah, only the ones that you know for certain.

A That I know submitted one.

Q Yes.

A Vinny [ph]. They were all court officers. I'm sure there's more. I don't want it to seem like I'm not -- I just don't remember. That's who -- for now, that's who I know for certain.

Q Okay. Did any of these officers show you their exemption requests?

A Yes.

Q Okay. When did they show you

J. BERGIN

their exemption requests?

A I can't answer that because there was a multi-step process where -- these are estimates -- we were informed of the mandates. I would say a short time later, the request was due for submission.

I'm sure I saw -- I've seen them before that before that point -- some before that point. There was a short time before it asked for supplemental information. In between supplemental and resubmission, I'm almost certain I've seen more for supplementals to those first ones.

Maybe even after denial, I can't say for sure, but over those months of where we were informed of the mandate and when we were denied, I've seen many and thereafter for this case as well.

Q Okay. I just want to talk about the time period from right now before the denial; okay?

Did any of these officers or anyone else assist you in drafting your

J. BERGIN

initial request? Did any of these officers or anyone else assist you in drafting the supplemental request? Any of those officers or anyone else.

A I do recall there were examples that were circulating to which I did not use.

EXAMINATION

BY MR. SIUDZINSKI:

Q Examples of the original request or the supplemental?

A Supplemental.

Q And who was circulating this?

A I don't recall. I just remember -- I recall -- I have seen that. I just chose to write my own.

Q When you say you saw them, you saw them hardcopy, electronic copy, something else?

A I don't remember.

Q Did you circulate either your original request or your supplemental request to anyone before submitting it to UCS?

J. BERGIN

A I don't think I did.
Q Inside or outside of UCS?
A To anyone?
Q To anyone.
A Before submitting it?
Q Before submitting it.
A Can I answer with 100 percent certainty? No. To the best of my recollection, I did not.
Q Do you recall anyone giving you suggestions or edits on how to draft it?
A Before submission?
Q Before submission.
A Probably.
Q Do you recall what that is?
A Any. More so through conversations.
Q And when you said through conversations because they had seen your draft or because you were talking about it?
A Probably the latter.
Q Do you recall showing your draft to coworkers at UCS?

J. BERGIN

A I don't know.

Q Did you share the draft with Pastor Ron?

A No.

EXAMINATION

BY MS. ROTHMAN:

Q When you said that -- correct me if I'm wrong -- when you said that you had talked about your request where you had received edits and/or suggestions, not because they had seen your request, but because you had talked about your request.

Do you recall how you discussed your request? Was it verbally, in an email, text message, or something else?

MR. WARSHAWSKY: I'm going to object to the form of the question.

A There was many, many general questions as we were also employed or working throughout this whole time if we're talking about in work. Most likely, texting as well.

I can't say for certain exact. Just many general conversations as to what

J. BERGIN

was occurring.

Q Was it just what was occurring, or did you have specific text message conversations with regard to what you wrote and what other people wrote in your religious exemption requests?

A Yeah, probably.

Q As you sit here today, do you still have any of those text message conversations?

A Probably.

MR. WARSHAWSKY: Text message conversations about what? Your question was so compound. When she said, "Yes, probably," she could've been saying yes to almost anything.

MR. SIUDZINSKI: Anything related to UCS's COVID-19 vaccination policy.

MR. WARSHAWSKY: Any discussions about the COVID-19 vaccination policy?

MR. SIUDZINSKI: Between September and December.

THE WITNESS: Can you just ask the question one more time? I apologize.

J. BERGIN

BY MS. ROTHMAN:

Q Sure. The text message conversations that you've had with any of your colleagues regarding the COVID-19 policy, as your sit here today, do you still have those text messages?

A Probably.

Q Okay. Text message that you have regarding your discussion of your answers on your religious exemption request, do you still have those text message conversations?

MR. WARSHAWSKY: I'm going to object to that question because I don't think she's actually testified to that specific point yet. That was the ambiguity of your prior question.

MS. ROTHMAN: I don't think there was an ambiguity, but I will certainly reask the question.

BY MS. ROTHMAN:

Q You have stated -- and again, correct me if I'm wrong -- that you had conversations in text message form

J. BERGIN

regarding your religious exemption request and answers you put in your religious exemption; is that correct?

A I don't think specifically I -- that's what I said.

Q Okay. Do you recall having a text message conversation with anybody in UCS regarding what you put in your religious exemptions, whether that be the initial exemption or your supplemental? And I'm talking only about before denial.

A And that doesn't have to include specific answers, that could be anything before.

Q Anything regarding your specific exemption requests.

A I'm sure I have those conversations, most likely. I can't say off the top of my head to the specifics of them.

Q Okay. As you sit here today, do you still have any of those text message conversations?

A Probably.

J. BERGIN

Q Okay. I'm going to ask that save those text message conversations and we will certainly be following with a request for those text message conversations.

Did you have any text message conversations with anybody at UCS regarding those there, meaning the people that you've had conversations, those people, their exemption request? Any responses they may have put in their request or anything regarding their requests, again, before your denial.

A Yes.

Q Okay. Do you still have those text message conversations?

A Probably.

Q Okay. Again, I'm going to ask that you save those, and we will make a response to follow up on it.

Do you have social media? Do you have any social media accounts?

A No.

Q No Instagram?

J. BERGIN

on or about December 29, 2021?

A Yes.

Q What if anything did you do upon receiving your denial?

A Just kept working.

Q Did you reach out to anybody?

A There were many conversations in the courthouse. I don't believe -- I don't remember at this time reaching out to anyone specifically.

Q Between when you submitted your request on November 16, 2021 and your denial on December 29th of 2021, did you have a conversation with anybody -- or I'm sorry -- a conversation with anybody at the courthouse regarding what you submitted as your supplemental?

A Yes.

Q Okay. Was it the people that we listed, Sam [ph], Melissa [ph], Carol [ph], Olivia [ph], Vinny [ph]?

A And many others.

Q Okay. Did they discuss with you what they wrote on their supplementals?

J. BERGIN

A That whole period is quite fuzzy, but I do recall many people saying to me thereafter why didn't I write yes or no?

Q And what was your response?

A I believed what I gave them was sufficient.

Q Okay. Did you maintain that position that what you believed your response was sufficient? Did you maintain that position up until the day before your denial?

A Up until I saw the word "denied," that's what I thought.

Q Okay. Did at any time before you received this denial, at any time did anyone tell you what you should or should not have done in addition to just saying yes or no?

A There was many conversations among many people in the confines of the courts, and again, not just myself. Many people wrote and said many different things.

J. BERGIN

So there was speculation all around as to who wrote right thing, who may or may not get denied because, again, everyone received their denials at different times, so some people weren't even approved or denied yet, so there was much conversation just regarding the entire topic.

Q You specifically -- I believe you had specifically said Olivia [ph] had also submitted a letter from the ICC; correct?

A That's my assumption; that's my belief.

Q How did you come to that belief?

A Through conversation. We're talking pre this case.

Q When did you first aware that Olivia [ph] had submitted a letter from the ICC?

A I don't remember.

Q Was it before this case?

A Yes.

Q Okay. Was it before you got

J. BERGIN

denied?

A Yes.

Q Okay. Do you know that Olivia [ph] had been granted an exemption?

A Yes.

Q When did you find out that Olivia [ph] had been granted her exemption?

A Around this time, I think. I don't remember an exact date.

Q Around the time you were denied?

A Yes, because within that, I guess you would say, few week or month period, all the approvals and denials were coming in, and it was known that she was one of them that were approved.

Q Was she approved before you received your denial?

A Don't know the answer.

Q Okay. Had you asked to see a copy of her initial exemption request and her supplemental request?

A I don't think I did.

Q Okay. After you received your

J. BERGIN

denial, did you reach out to anybody -- any supervisors -- at Richmond County Courthouse with respect to reversing your denial, submitting any other information, or anything like that?

A Can I go back to the last question? Can I answer both of them? I just want to add something to the last question.

Q Sure.

A I just can't say with certainty if I saw any of her documents. Your question was did I request them. I don't think I did. I'm uncertain because I saw many, if I saw hers. I just wanted to make that clear.

As far as the second question, did I ask anyone, specifically, supervisory, if I could resubmit? Is that the question?

Q Yeah, any supervisors at Richmond County if you could resubmit or how to reverse a denial or anything like that.

J. BERGIN

A Yes.

Q And when did you obtain those exemption requests?

A All different times. There -- there were some that were emailed to me -- all of which you have -- some were emailed to me directly from people that wanted to help, essentially. I don't remember the length; I'm sure I could check the timestamps.

Some might have been in the -- when I was in the courthouse. I would say from the time of the mandate until the denial, in that time period, but I don't have exact time 'cause it was different.

Q Any of the -- or, wait. Withdraw that. The ones that you received that you exchanged with us, did you know if all of those employees were granted an exemption or denied an exemption?

A I believe -- I always like to believe that most of those people were approved. Can I say that for a surety that I know that person is still there?

J. BERGIN

connectivity interruption--

A Those are just conversations. I -- I don't remember asking for or soliciting anyone's exemptions.

Q And you said, though, that these might've been circulating around, not just given to you?

A It's possible.

Q And what is your understanding of why those might've been circulating around at that time?

A I can't speak for other people. Possibly just seeing who was approved, who was denied, comparing them.

Q Part of these conversations that were going on -- you said that there were many conversations -- did the conversations include discussions of the answers that got granted verses the answers that got denied?

A I don't remember specifics of the conversations because, again, it was such a choppy timeline about people getting approved, people getting denied.

J. BERGIN

THE WITNESS: No.

BY MS. ROTHMAN:

Q I'm going to show you an email that you have provided. It's dated January 1st. It's from you to Carolyn Grimaldi. At the very frame, Bates Stamped at the bottom, it's Bergin 00022, and actually, we're going to mark this as -- we're at this point -- Exhibit F. Do you recognize this document?

(Exhibit F was marked for identification.)

A I do.

Q Okay. What is this document that you're looking at?

A This is an email from my court email address that I had sent to Carolyn Grimaldi [ph].

Q Okay. And it was dated January 1st.

A Yes.

Q And are you going to believe that's January 1st of 22?

A Yes.

J. BERGIN

Q It says on the second line, "I have been informed that I may have been denied on format, as opposed to sincerity." When you say you've been informed, what did you mean by that?

A I mean the conversations I've had with people.

Q With who?

A Family, people in the courthouse. Once people found out that I had been denied, then I would get the denied conversations. So I had just written quietly to be respectful or formal what I wrote her.

Q Did any of you supervisors at Richmond County Courthouse tell you that you had been denied based on format?

A No.

Q Okay. Did anyone from the vaccine exemption committee tell you that you had been denied based on format?

A No.

Q So your information came solely from anecdotal conversations you had with

J. BERGIN

colleagues?

A correct.

Q Okay.

A And others.

Q So at this time, you believed, or as you say in this email, that your denial was based on format, as opposed to sincerity.

A That's what I believed.

Q Okay.

MS. ROTHMAN: I've got to go through my notes, but, like, if you have anything for them?

MR. SIUDZINSKI: Let's take five minutes, then, if that's all right.

THE REPORTER: All right. We are off the record.

(Off the record.)

THE REPORTER: Okay. It is two o'clock in the afternoon. We are back on the record.

//

//

//